BOGGS, J., delivered the opinion of the court. DAUGHTREY, J. (pp. 765-67), delivered a separate opinion concurring in the reasoning and the result of the majority. MARTIN, J. (pp. 767-71), delivered a separate dissenting opinion.
OPINION
BOGGS, Circuit Judge.
Nicholas T. Sutton is a Tennessee prisoner sentenced to death for murdering a fellow prisoner. He petitions for a writ of habeas corpus on the grounds that his trial counsel was constitutionally ineffective. We affirm the district court’s denial of habeas relief.
I. Background
On January 15, 1985, Carl Estep, an inmate at Tennessee’s Morgan County Regional Correctional Facility, was murdered in his cell. He was stabbed thirty-eight times in the chest and neck with two homemade knives, or “shanks,” which were found near his body. Defensive wounds on his hands and arms, as well as blood on his body, the walls, and the bunk, indicated that there had been a struggle!
Sutton, Thomas Street, and Charles Freeman were charged with Estep’s murder. At trial, the primary evidence against Sutton was the testimony of three other inmates, Harold Meadows, Estel Green, and Cary Scoggins. Meadows testified that, shortly before the body was discovered, he saw Sutton and Street enter *755 Estep’s cell and heard Estep scream. He also claimed that two days before, Sutton and Estep had a “physical” discussion, during which Sutton held a knife to Estep’s throat. Green testified that he also saw Sutton and another inmate go into Estep’s cell and that he heard Estep screaming while Sutton was inside. Scoggins explained that Sutton and Estep had been feuding over a drug deal, and that Estep had threatened to kill Sutton. Scoggins also testified that he saw Sutton, Street, and Freeman enter Estep’s cell, and that he watched through the cell-door window as Sutton repeatedly stabbed Estep.
The jury convicted Sutton and Street but acquitted Freeman. Sutton was sentenced to death based on three statutory aggravating circumstances: (1) he had previously been convicted of a violent felony, first-degree murder; (2) he was incarcerated at the time of Estep’s murder; and (3) Estep’s murder was “heinous, atrocious, or cruel.” See Tenn.Code Ann. § 39-2-203(i)(2), (5), (8) (1986). The Tennessee Supreme Court affirmed the conviction and sentence on direct appeal, State v. Sutton, 761 S.W.2d 763 (Tenn.1988), and the Tennessee Court of Criminal Appeals rejected Sutton’s petition for postconviction relief, Sutton v. State, 1999 WL 423005 (Tenn.Crim.App. June 25, 1999).
Sutton appeals from the district court’s denial of his petition for a writ of habeas corpus. He has received a certificate of appealability on four ineffective-assistance-of-counsel claims: (1) that his counsel failed to object to two aspects of courtroom security during the guilt phase; (2) that his counsel failed to object to three instances of prosecutorial misconduct during the guilt and penalty phases; (3) that his counsel failed to object to the penalty-phase jury instructions on the “heinous, atrocious, or cruel” aggravating circumstance; and (4) that his counsel failed to adequately investigate and present mitigating evidence of the amount of violence in Tennessee prisons and of his troubled background.
II. Standard of Review
Sutton’s ineffective-assistance claims are governed by the familiar standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He “must show that counsel’s representation fell below an objective standard of reasonableness” and “that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 688, 694, 104 S.Ct. 2052. Given the prejudice requirement, “counsel cannot be ineffective for a failure to raise an issue that lacks merit.” Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir.2001).
All of Sutton’s claims were adjudicated on the merits by the Tennessee state courts on postconviction review. Therefore, we may not grant the writ unless the state court decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,” or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). An adjudication is contrary to clearly established law if, for example, the “state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.” Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is unreasonable if, for example, “the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner’s case.” Id. at 407, 120 S.Ct. 1495. The application must be “objectively unreason *756 able,” not merely incorrect. Id. at 409-10, 120 S.Ct. 1495.
III. Trial Security
Sutton’s first claim is that his counsel was constitutionally ineffective for failing to raise two objections under Holbrook v. Flynn, which prohibits trial “practices” that “prejudice” the defendant without “sufficient cause.” 475 U.S. 560, 568, 571, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). He first argues that his counsel should have objected to “the conspicuous, or at least noticeable, deployment of’ ten uniformed guards in the courtroom,[1] seven of whom were armed, because they suggested “official concern or alarm” that he was “particularly dangerous or culpable,” id. at 569, 106 S.Ct. 1340.
The state appellate court reasonably rejected this claim because the underlying Flynn claim failed. The guards’ presence likely caused little prejudice: as the trial judge testified during postconviction proceedings, they were “not overly conspicuous” because they were spaced out in the very full courtroom — four were behind the defense table, one was next to the jury, two were in the balcony, and one was posted at each of the courtroom’s three doors. And we agree with the trial judge that the legitimate security concerns involved in trying three inmates for violently murdering a fourth inmate, where the defendants were not wearing upper-body restraints and six other inmates were testifying as witnesses, was “sufficient cause” for any prejudice. See Flynn, 475 U.S. at 571, 106 S.Ct. 1340 (holding that “the State’s need to maintain custody over defendants who had been denied bail” as flight risks was “sufficient cause” for whatever prejudice resulted from the “spectacle of four [uniformed and armed] officers quietly sitting” behind the defendants); Bell v. Hurley, 97 Fed.Appx. 11, 16-17 (6th Cir.2004) (noting that visibly shackling the defendant — which, unlike the presence of guards, is “inherently prejudicial” under Flynn — was justified because he was accused of attacking a guard during a prison riot); see also Deck v. Missouri, 544 U.S. 622, 632, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) (recognizing “the need to give trial courts latitude in making individualized security determinations”); United States v. Barger, 931 F.2d 359, 371 (6th Cir.1991) (“[T]he degree of security relating to a defendant is within the [trial] judge’s discretion.”).
Sutton also contends that his counsel should have raised a Flynn objection to what he calls the “shanks incident.” Before introducing the murder weapons into evidence, the prosecutor placed them on the defense table, within reach of the defendants, for inspection by counsel. Sutton’s counsel jerked away from him in fear and the guards reached for their weapons; there is conflicting testimony over whether any were actually drawn. Although the shanks were moved to the state’s table for inspection without further incident, Sutton claims that his counsel’s and the guards’ reactions suggested that he was very dangerous and were therefore so “prejudicial as to pose an unacceptable threat to [his] right to a fair trial,” Flynn, 475 U.S. at 572, 106 S.Ct. 1340.
The state court again rejected Sutton’s ineffective-assistance claim because the underlying Flynn claim failed. This decision was not contrary to or an unreasonable application of clearly established Supreme *757 Court law because “[n]o holdings of [the Supreme] Court required the [state court] to apply the test of ... Flynn to” counsel’s and the guards’ reactions, Carey v. Musladin, 549 U.S. 70, 75-77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). In Musladin, the Supreme Court held that Flynn’s application to “private-actor[s’] courtroom conduct” was an open question under its case law, and therefore a state court’s application of Flynn to spectators’ conduct could be neither contrary to nor an unreasonable application of Flynn. Ibid. Sutton’s counsel was a private actor, at least for these purposes, and therefore we cannot say the state court’s decision that his reaction did not cause Flynn error was improper. See ibid.
Flynn’s applicability to the guards’ reaction is similarly uncertain. As Musladin noted, Flynn and its related case law focus exclusively on “state sponsored practices,” id. at 75-77, 127 S.Ct. 649 (emphasis added); they do not address security’s response to, e.g., courtroom outbursts or attacks. See Flynn, 475 U.S. at 567-71, 106 S.Ct. 1340 (discussing “practices” and “procedures” such as the presence of guards); Estelle v. Williams, 425 U.S. 501, 503-04, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (addressing the “practice” and “procedure” of requiring defendants to wear prison clothes); Illinois v. Allen, 397 U.S. 337, 340, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (addressing the binding and gagging of defendants). Furthermore, courts have long recognized that forceful reactions to courtroom outbursts or attacks may require a new trial even where there was “sufficient cause” for the response — and thus where Flynn would not imply a constitutional error. See, e.g., United States v. Serio, 440 F.2d 827, 830-31 (6th Cir.1971) (collecting cases, on direct appeal, about requests for a mistrial based on courtroom outbursts or attacks); Braswell v. United States, 200 F.2d 597, 600-02 (5th Cir.1952) (holding on direct appeal that the trial judge improperly refused to grant a mistrial after two of the defendants violently attacked a United States Marshal and were forcefully subdued in front of the jury).[2] The lack of a textual mandate, plus the existence of doctrine predating Flynn that more stringently evaluates events such as the shanks incident, leads us to conclude that, at the least, Flynn’s applicability to the guards’ reaction is an open question. Therefore, we cannot say that the state court improperly applied Flynn to the guards’ reactions. See Musladin, 549 U.S. at 77, 127 S.Ct. 649.
IV. Prosecutorial Misconduct
Sutton’s next claim is that his counsel failed to object to three statements in the prosecutor’s closing arguments. First, Sutton argues that his counsel should have objected to the prosecutor’s guilt-phase comment suggesting that Sutton was guilty because he was arrested for the murder:
Now, use your common sense here for a moment. Who was locked up immediately after this body was found and the very first information received? They are sitting right over there. Do you think [the prison authorities] said, “Oh let’s see, we got a dead man here, lock up Street, Sutton and Freeman.” Do any of you believe that?
*758 The state appellate court rightly noted that this comment was improper, but it concluded that Sutton was not prejudiced by his counsel’s failure to object.[3] This was reasonable. Any prejudice from this comment affected only Sutton’s factual guilt. However, the evidence of his factual guilt was strong: although the inmate-witnesses’ testimony was contradictory and weak on some matters, it was consistent and persuasive on Sutton’s involvement in and motive for Estep’s murder. Therefore, we do not think there is a reasonable probability that an objection to this comment would have led to Sutton’s acquittal.
Second, Sutton challenges his counsel’s failure to object to the prosecutor’s guilt-phase discussion of inmate Carl Crafton’s testimony. Crafton testified as a defense expert on prison life, describing the violence then endemic in the Tennessee prison system because of overcrowding and guards’ inability to keep order, as well as the culture and incentives this created for prisoners. In particular, he explained that once an inmate’s life had been threatened, “his only defense!] is to make the offensive move.” Sutton relied on this testimony to argue that, if he did kill Estep, he did so in self defense because Estep had threatened to kill him.
Sutton claims that the prosecutor “deliberately misled the jury by claiming that Crafton advocated violent prisons where inmates lived by their own rules”:
Do you, as jurors, want to accept that kind of person as an expert; as someone who is going to tell you the way things, not normally are, but should be in the prison system? Because that is the key; not necessarily how things are, but how things should be.... Are you willing ... to accept the kind of prison system that he seems to think you ought to have? ... And apparently he does not put any value or significance to the rules of society and the laws that we all have to live under.... What was the last thing he said when asked, “Well, who is supposed to run the prisons?” He knew better than to try and tell you that the prisoners should, so what did he come up with? “By the Warden’s rules.” And you all know what rules the Warden has. The same rules that you and I have; the same laws that you and I have.
The state court concluded that this comment was also improper but not prejudicial. This was reasonable because Sutton’s preemptive-strike self-defense theory failed as a matter of state law. See State v. Leaphart, 673 S.W.2d 870, 873 (Tenn.Crim.App.1983) (holding that the lack of an imminent threat precludes preemptive killing from qualifying as self-defense).
Third, Sutton contends that his counsel should have objected to the prosecutor’s penalty-phase future-dangerousness argument:
*759 What do we do? If a person is already in the penitentiary, already serving time for [a]rmed [rjobbery or a life sentence for [mjurder, what is the next step? The days of chaining people to a wall in the dungeon are gone because that would violate their rights; it would be cruel and inhuman punishment. You cannot ship them off to some island so that they are all by themselves. If they are going to be in that penitentiary and they are going to be in contact with other people, then ask yourselves and ask the Defense to tell you what they would have you do with people in that situation.... [One witness] talked about students and how you deal with them; that you give them a chance and another chance.... Well, I submit the line was drawn on these Defendants, before you ever heard of them, when they were sent to the penitentiary to serve their time. And what are you, as jurors, now going to do, send them to the penitentiary? What are you going to do to Nicholas Sutton, give him a life sentence? Will that prevent there being another Carl Estep?
[W]e suggest to you that persons who are armed robbers and first degree murderers are already conditioned to kill people. We say to you this ... that all of you told all of us in the beginning, and obviously you were sincere about it, that you believed in the right of a person to self-defense only when absolutely necessary, and you know what the law is about that. The legislature of this state, as well as the legislature of almost every other state, has given all of us the right of self-defense; not just personally, but as a group, and that is called, ‘Capital Punishment.’ When we get to the point that we have done everything possible to protect ourselves and there is nothing else we can reasonably do that would protect ourselves from people like Nicholas Todd Sutton ... then we have the right of self-defense and that is where capital punishment comes in.
These statements were not improper as a matter of federal law: they were not inflammatory, and future-dangerousness arguments are permissible under federal law, Jurek v. Texas, 428 U.S. 262, 275, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The state court concluded that they were improper under state law because they suggested that the jury consider deterrence, which is not relevant to any statutory aggravating factor. Nonetheless, the court decided that Sutton was not prejudiced,[4] which was reasonable given the overwhelming aggravating circumstances. Furthermore, any impropriety under state law was harmless because we conclude that the prior-violent-felony and prison-murder statutory aggravators allowed the jury to consider the prosecutor’s argument that only death will prevent Sutton from killing again, and that death is the proper punishment for someone who killed while in prison for murder. Cf. Brown v. Sanders, 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) (explaining that, in capital cases, the consideration of sentencing factors that are improper under state law is constitutional error, but holding that such error is harmless if the federal court determines that other, proper factors allow consideration of “the same facts and circumstances”).[5]
*760 V. Penalty Phase Jury Instructions
Sutton’s third ineffectiveness claim is that his counsel should have argued that the penalty-phase jury instructions on the “heinous, atrocious, and cruel” aggravating circumstance were unconstitutionally vague. This claim fails for lack of prejudice. The Tennessee Supreme Court reviewed and affirmed the jury’s finding of the aggravator on direct appeal. Because there is no “affirmative indication to the contrary, we must presume that it” applied its well-established, and permissible, narrowing construction of the aggravator, thereby “cur[ing] any error in the jury instruction.” Bell v. Cone, 543 U.S. 447, 453-56, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005) (per curiam) (rejecting an identical challenge to Tennessee’s “heinous, atrocious, and cruel” aggravator for this reason); see also Payne v. Bell, 418 F.3d 644, 653-60 (6th Cir.2005) (same).
VI. Mitigating Evidence
Sutton’s final claim is that his counsel failed to adequately investigate and present mitigation evidence. At the sentencing hearing, counsel presented additional testimony from Crafton to support the statutory mitigating circumstance that Sutton was acting under the belief that his actions were morally justified. Counsel also presented the testimony of the Burchetts, a family who had known Sutton since he was in high school and who visited him regularly in prison. This testimony was intended to humanize Sutton and to show that he is capable of having normal relationships with law-abiding citizens.
Sutton first argues that, in addition to Crafton’s testimony about the violent conditions in Tennessee prisons, counsel should have presented the testimony of a particular TDOC corrections officer and documents from Grubbs v. Bradley, a federal lawsuit that, from 1980 to 1993, evaluated the violent conditions in Tennessee prisons, see, e.g., 552 F.Supp. 1052 (M.D.Tenn.1982). The state court reasonably rejected this claim for lack of prejudice. The additional evidence would have been cumulative and added little or no extra mitigating value, particularly since we think it is unlikely that the jury did not believe Crafton that prison was violent given his status as a court-sanctioned expert and the nature of the crime at issue. See Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir.2005) (“[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter— from the evidence actually presented at sentencing.”).
Sutton also argues that his trial counsel should have discovered and pre *761 sented evidence of his troubled background. This evidence was presented at postconviction proceedings by Dr. Gillian Blah’, a licensed clinical psychologist who evaluated Sutton. The state appellate court summarized her testimony:
[Blair] testified ... that [Sutton] was raised in an unstable, often violent and threatening home life where the supervision and structure were inadequate. He was exposed as a child to intermittent explosive violence from his father, who was seriously mentally ill and was hospitalized extensively at a psychiatric hospital between 1969 to 1976. In 1973, there was a restraining order against the father after he held his mother and [Sutton] at gun point and had a standoff with the police. In contrast, when [Sutton’s] father was not being violent, he would be overindulgent and encourage inappropriate behavior. In 1977, [Sutton’s] father died of hypothermia and exposure. The death certificate indicated that alcohol abuse was a contributing factor in his death.
From the time of his incarceration at age 18, the threatening environment that [Sutton] had endured as a child was present in TDOC. The prison offered little structure or predictability. [He] had to be hyper-vigilant, and this was exacerbated by the fact that a number of inmates had access to weapons and that there were a number of assaults in prison.
As a child, [Sutton] suffered multiple abandonments and losses. Specifically, his mother abandoned him before the age of one, he essentially lost his father to mental illness, and ultimately he suffered the death of his father. Moreover, the circumstances of his father’s death were never explained to him. [He] also suffered the loss of his grandfather at the age of 7 or 8, and the separation from his maternal grandparents at the age of 2. He was essentially raised by his paternal grandmother, who was a school teacher.
[Sutton] has an extensive drug history. By the time he was an adolescent, he was using a wide variety of drugs. [He] admitted the he had dealt drugs extensively as well, to provide a means of obtaining his own drugs and to provide himself some money. His lack of internal controls was exacerbated by his drug use.
Eventually, [Sutton’s] juvenile problems and drug abuse led to him being sent to Knoxville to live with his aunt and attend high school. While he failed some classes, he did not fail a grade. He eventually dropped out of high school during the eleventh grade. In 1978, [Sutton] received his GED at a community college. At age 17, [he] joined the Navy from November to December of 1978. He received an honorable discharge, however, the records indicate that he was unable to adjust to military life. [Sutton] was described as being overwhelmed by the training and unable to adjust to the emotional pressure. According to the records, [his] attitude toward authority was respectful. Thereafter, [Sutton] was incarcerated at the age of 18 [for murder] and has been incarcerated continually since that time.
[Sutton’s] medical records were limited. He was shot in the eye at the age of 9. He had several head injuries which lead [sic] to a loss of consciousness. One such incident involved a motorcycle accident when [Sutton] was 12. [He] also suffered sporting accidents at age 13 and 15. In addition, [he] was shot in the knee at the age of 16. There is no record of [Sutton] having any psychiatric history or treatment before entering TDOC.
*762 According to Blair, the TDOC records indicated that if kept in a safe and structured environment, [Sutton] is well-adjusted, presents no management problems, and is not violent. Blair admitted that at the time of the trial, her profession felt that it was difficult to predict future dangerousness and that the key indicator was a past history of violence. She further admitted that this factor would not have weighed in favor of [Sutton],
Blair concluded that the cumulative data, social history, interview, and test results supported personality traits that would have rendered [Sutton] vulnerable to prevailing conditions in TDOC during the early 1980s. Those conditions included an unstable, violent, and threatening environment, where supervision and structure were inadequate to the number of inmates. She did not find any sign of cognitive impairment or organic process. Nor did Blair find any suggestion of thought disorder or any type of psychosis.
Blair’s primary diagnosis was that [Sutton] has an Axis II personality disorder. Tension consistent with an underlying anxiety disorder was also evident. According to Blair, individuals with these profiles tend to be blunt, self-critical, and have inadequate defense mechanisms. The observed clinical profile was consistent with a pattern of chronic maladjustment. These individuals tend to be suspicious, alienated, self-indulgent, and narcissistic, with immature, manipulative, and somewhat aggressive behaviors. Blair agreed with a previous diagnosis of antisocial personality disorder.
The probability of a different sentence had this evidence been presented is a function of the strength of the aggravating circumstances and the net mitigating value of Sutton’s troubled background. See Wiggins v. Smith, 539 U.S. 510, 516-18, 534, 536-38, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (“In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”); Williams, 529 U.S. at 396-98, 120 S.Ct. 1495 (considering prejudice de novo and balancing the proposed evidence’s mitigating value, its potential harm, and the aggravating circumstances); Carter v. Mitchell, 443 F.3d 517, 530-33 (6th Cir.2006) (holding that the state court’s decision was reasonable because the proposed troubled-background evidence likely “would have done more harm than good”). The state appellate court weighed these factors and concluded that Sutton’s troubled-background evidence would not have created a reasonable probability of a life sentence. We cannot say that the state court unreasonably considered, or gave unreasonable weight to, any factor, or that its ultimate balancing of the variables was unreasonable.[6]
*763 The aggravating circumstances were, as the state court suggested, overwhelming: while in prison for first-degree murder, Sutton planned and carried out the killing and mutilation of another inmate because of a drug deal. The prior-violent-felony and prison-murder statutory aggravators are undisputable and weigh strongly against Sutton, and the jury’s finding of a third statutory aggravator, that the murder was “heinous, atrocious, or cruel,” reflects the brutality of the murder and suggests that the jury believed that the aggravating circumstances were extraordinary.
Given these aggravating circumstances, only evidence with an overwhelming net mitigating value could produce a reasonable probability of a life sentence. The state court reasonably noted two points suggesting that, while the mitigating value of Sutton’s troubled background evidence might be substantial, it was not overwhelming. First, the court observed that Sutton offered “little positive or redeeming evidence.” This is true, as the mitigating value of Sutton’s background comes primarily from its troubled nature, and what little was positive — primarily that he once saved a guard during a prison fight — was not overwhelming. Thus that avenue of mitigation would have been of little or no benefit to Sutton.
Second, the court noted that Sutton’s troubled past did not reflect the sort of extreme deprivation or mental and emotional problems that might be thought to reduce his culpability to a critical degree. Sutton v. State, 1999 WL 423005, at * 18. Sutton’s background is undeniably chaotic and unfortunate, but he did have one constant and positive influence: his grandmother, who raised him and adequately provided for him. And, as Dr. Blair conceded, Sutton had no mental disease or severe emotional disturbances; he merely had a personality disorder reflecting unexceptional maladjustment. See Wickline v. Mitchell, 319 F.3d 813, 821 (6th Cir.2003) (noting that the defendant “did not suffer from any mental condition” and suggesting that his depression was a “weak mitigating factor” (internal quotation marks omitted)).
This limited mitigating value must be weighed against the potential harm its introduction might have done to Sutton’s mitigation case. It is well established that facts such as Sutton’s extensive involvement with drugs and his discharge from the Navy are often viewed by juries as harmful, and this must be counted against the proposed evidence’s mitigating value. See, e.g., Williams, 529 U.S. at 396, 120 S.Ct. 1495 (balancing the unfavorableness of the defendant’s juvenile convictions against other, favorable evidence); Burger v. Kemp, 483 U.S. 776, 793, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (noting that evidence of the defendant’s “involve[ment] with drugs” “could have affected the jury adversely”); Carter, 443 F.3d at 530 (noting that evidence of, inter alia, a “history of drug use and alcohol abuse” would be “double edge[d]”).
The state court also reasonably considered the possibility that presentation of Sutton’s troubled-background evidence would have “potentially opened the door” to devastating rebuttal evidence of his pri- or violent acts, in particular the fact that he brutally beat his grandmother to death after she found out that he had murdered two other people. See Mason v. Mitchell, 543 F.3d 766, 780-83 (6th Cir.2008) (weighing the possibility that damaging rebuttal evidence would be introduced); Scott v. Mitchell, 209 F.3d 854, 880-81 (6th Cir.2000) (explaining that the proposed background evidence’s mitigating value would have been “largely, even overwhelmingly, negated” because it would have allowed *764 the prosecutor to elicit “evidence that his background includes commission of robbery, assault, kidnaping, [sic] and other violent acts upon innocent citizens”). Even discounted by a relatively low probability of admission, the expected value of such devastating rebuttal evidence is quite large, and it significantly reduces the net mitigating value of Sutton’s background. Cf. Rickman v. Bell, 131 F.3d 1150, 1157-60 (6th Cir.1997) (excoriating counsel for introducing evidence of his client’s violent and troubled background that “creat[ed] a loathsome image ... that would make a juror feel compelled to rid the world of him”).
Perhaps Sutton is correct that competent counsel likely could have presented evidence of his troubled background without making such rebuttal evidence relevant, and thus admissible. See Carter v. Bell, 218 F.3d 581, 597-600 (6th Cir.2000) (concluding that, under Tennessee law, competent counsel likely could have introduced troubled-background evidence without allowing the introduction of rebuttal evidence of his prior violent acts (citing Cozzolino v. State, 584 S.W.2d 765, 767-68 (Tenn.1979))). However, the state court evaluated Sutton’s troubled-background evidence under state law and concluded that there was at least a colorable chance that the trial judge would have ruled that its presentation would allow the introduction of such rebuttal evidence, perhaps because the background evidence touched on Sutton’s juvenile crimes and violent behavior. We presume that the state court properly applied its own law, see Cone, 543 U.S. at 453-56, 125 S.Ct. 847, and we defer to its estimation that there was some recognizable “potential[ ]” that the rebuttal evidence would be admitted since it is better suited to predict state law than we are. See Carter, 218 F.3d at 599-600 (noting that this court “g[ives] deference” to state court determinations of the possible admissibility of rebuttal evidence in these situations); Scott, 209 F.3d at 880-81 (deferring to such a state court determination).
Nor can we say that the state court’s balancing of these variables was unreasonable. The mitigating value of Sutton’s background was not overwhelming, and it is countered by the double-edged nature of significant portions of his background and the small, though potentially devastating, danger of rebuttal evidence. As a result, the evidence’s net mitigating value was dwarfed by the extreme aggravating circumstances. And while the prejudice inquiry is unavoidably case-specific and fact-intensive, we are satisfied that our decision is in the mainstream of failure-to-introduce-mitigating-evidence case law decided under AEDPA’s strictures. See, e.g., Wickline, 319 F.3d at 821-22 (holding that the state court reasonably concluded that the mitigating value of evidence about the defendant’s mental health, good behavior, and troubled background was insufficient to establish prejudice); Williams v. Cain, 125 F.3d 269, 277, 279-80 (5th Cir.1997) (holding that the state court reasonably concluded that the defendant was not prejudiced by counsel’s failure to present evidence of “ ‘chaotic, violence-filled childhood’ ” because the evidence “likely would have had little mitigating effect against the aggravating evidence concerning the brutal, premeditated murder ..., [his] prior criminal history, and the fact that [he] hid [evidence]”); Campbell v. Kincheloe, 829 F.2d 1453, 1464 (9th Cir.1987) (concluding that the defendant was not prejudiced by counsel’s failure to present evidence that his “father was an alcoholic; [he] was the victim of child abuse; he suffered from various medical problems as a young child; he had a history of drug and alcohol abuse; [and] he had reportedly attempted suicide on one occasion” because the mitigating value of this evidence did not outweigh the *765 aggravating circumstances that he sought out, beat, strangled, and killed a woman who had testified against him, and then cut the throats of her daughter and another witness).
We also note that in every case on which Sutton relies, the federal court weighed the mitigating and aggravating circumstances de novo, rather than evaluated the reasonableness of the state court’s weighing; thus they are inappropriate comparisons. See Wiggins, 539 U.S. at 516-18, 534, 536-38, 123 S.Ct. 2527 (weighing de novo because no state court addressed prejudice); Williams, 529 U.S. at 398, 120 S.Ct. 1495 (weighing de novo because the state court did not apply the correct legal rule and did not consider all of the mitigating evidence, see Magana v. Hofbauer, 263 F.3d 542, 551 (6th Cir.2001)); Harries v. Bell, 417 F.3d 631, 634, 640 (6th Cir.2005) (weighing de novo because the habeas petition was filed before AEDPA’s effective date); Coleman v. Mitchell, 268 F.3d 417, 427, 452 (6th Cir.2001) (same); Carter, 218 F.3d at 591, 593, 600 (same).
Nor can we say that it was unreasonable to conclude that the totality of the proffered mitigating evidence — the Burchetts’ testimony, all of the evidence about the violence in Tennessee’s prisons, and the evidence of Sutton’s troubled background — did not create a reasonable probability of a life sentence. The net mitigating value of all of this evidence is too low, and the aggravating circumstances are too strong.
VII. Conclusion
We AFFIRM the district court’s denial of habeas relief.

. We need not consider the plainclothes guards in the spectator seating area or the heavily-armed guards outside the courtroom because they were not visible to the jury. See Flynn, 475 U.S. at 569, 106 S.Ct. 1340 (explaining that "the use of identifiable security officers” can prejudice defendants).

. We note that any prejudice resulting from the shanks incident was properly analyzed through Sutton’s prosecutorial misconduct claim, see United States v. Beverly, 369 F.3d 516, 543 (6th Cir.2004) (noting that one factor in the flagrance analysis is whether the prosecutor's actions prejudiced the defendant), since the incident initially stemmed from the prosecutor's actions.. This claim was rejected by the state courts on direct appeal and by the district court below, and is not raised before us.

. The slate court “[did] not find that [the comment] affected the verdict.” This conclusion can be interpreted two ways: that the comment did not change the outcome or that it had no effect at all, i.e., that there is no chance that the comment changed the outcome. The former meaning is improper: Strickland prejudice requires only a "reasonable probability” of changing the outcome. However, the latter interpretation is a proper one, as no probability of changing the outcome is lower than a reasonable one. We give the state court the "benefit of the doubt” and conclude that it applied the correct standard. See Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (noting that federal courts should "presum[e] that state courts know and follow the law”). Regardless, we would reject Sutton’s claim even under de novo review for the same reasons that make the state court's decision reasonable.

. The state court again "d[id] not find that the jury's decision was affected.” As explained in footnote 3, we grant the state court the benefit of the doubt and presume that it applied the correct standard. We would also reject this claim de novo.

. This reasoning is, admittedly, in tension with the state court's decision because it sug *760 gests that the prosecutor's argument was relevant to proper aggravating factors. The state court's conclusion that the argument was not relevant to any proper factors — and thus was improper — was based only on its assertion that the argument was deterrence-based, rather than an analysis of the argument’s substance. We, of course, accept the state court's determination that deterrence arguments are improper under state law. However, we think that the state court’s classification of the argument is fundamentally a factual determination, and we note that the transcript is clear and convincing evidence that this classification was wrong, see 28 U.S.C. § 2254(e)(1): the prosecutor's argument reflects an incapacitation theory of punishment, with some retributive elements, and nothing in the argument suggests that death will deter Sutton or anyone else. Since the prison-murder and prior-violent-felony aggravators suggest that the prosecutor’s line of argument is a relevant concern, we think that, properly understood, the prosecutor's argument was not improper at all. See State v. Irick, 762 S.W.2d 121, 131 (Tenn.1988) (explaining that sentencing arguments are proper under Tennessee law if they are relevant to a statutory aggravating factor).

. Because we conclude that the state appellate court reasonably held that Sutton did not establish prejudice, we need not evaluate whether Sutton’s counsel was deficient in failing to discover some of this information or in choosing not to present it. We also need not address whether the state trial court’s holding that Sutton’s counsel was not deficient receives § 2254(d) deference. Cf. Wiggins, 539 U.S. at 535, 123 S.Ct. 2527 (explaining that prejudice is reviewed de novo when “neither of the state courts below reached [that] prong of the Strickland analysis” (emphasis added)); see also Yeboah-Sefah v. Ficco, 556 F.3d 53, 79-80 (1st Cir.2009) (noting that “it is not clear whether an adjudication on the merits by a trial court, which is neither explicitly affirmed on the merits nor explicitly rejected by the appellate court, is sufficient to trigger AEDPA review,” but not deciding the question (internal quotation marks omitted)); DeBerry v. Portuondo, 403 F.3d 57, 68 (2d Cir.2005) (same).