*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KELLY FOUST,

                *Petitioner-Appellant,*

    *v.*

MARK C. HOUK, Warden,

                *Respondent-Appellee.*

No. 08-4100

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-02625—Jack Zouhary, District Judge.

Argued: April 26, 2011

Decided and Filed: August 25, 2011

Before: BATCHELDER, Chief Judge; MOORE and CLAY, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Jeffrey M. Gamso, GAMSO, HELMICK & HOOLAHAN, Toledo, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jeffrey M. Gamso, Jeffrey J. Helmick, GAMSO, HELMICK & HOOLAHAN, Toledo, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

    MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. BATCHELDER, C. J. (pp. 32–37), delivered a separate dissenting opinion.

_____

### OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. Petitioner Kelly Foust, a death-row prisoner in Ohio, was convicted of murdering Jose Coreano, raping Damaris Coreano, setting the Coreanos' house on fire, and related offenses. At the mitigation hearing,

1

Foust's mother, Foust's father, and defense psychologist Dr. James Karpawich testified on Foust's behalf. Although their testimony depicted an unpleasant childhood with an emotionally distant and abusive father, their testimony pales in comparison to the horrific accounts detailed in records from Children's Services and in affidavits from Foust's siblings. The records and affidavits reveal the squalor of Foust's childhood home: feces on the walls; vomit on the floor; infestations of lice, cockroaches, flies, and mice; piles of filled garbage bags, filthy clothes, and dirty dishes; little food and frequent utility outages; children who had not bathed for a month; and conditions so vile that a cleaning crew called the residence an "uninhabitable" "pig sty" and refused to return. The new evidence explains how Foust's mother, not just his father, physically and emotionally abused Foust by, for example, calling Foust a "worthless piece of shit" when he tried to impress his mother with good grades and a new job. The records and affidavits document rape, incest, and sexual abuse among several of Foust's siblings. The new evidence also reveals Foust's attempt to help his younger sister reshape the family's trajectory.

The three-judge panel that sentenced Foust to death never heard these vivid facts because Foust's counsel provided ineffective assistance. In preparation for the mitigation hearing, Foust's attorneys did not interview any potential witnesses. The attorneys did not gather any records from Children's Services, despite Karpawich's repeated reminders. The attorneys did not prepare Foust's parents or Karpawich in advance of their testimony at the mitigation hearing. The attorneys hired Karpawich in lieu of a trained mitigation specialist, even though Karpawich informed the attorneys that he was not a trained mitigation specialist.

For these reasons, we **REVERSE** the district court's denial of Foust's petition on the basis of ineffective assistance of counsel at the mitigation hearing. We **GRANT** a conditional writ of habeas corpus vacating Foust's death sentence, unless the State of Ohio begins a new mitigation hearing against Foust within 180 days from the date on which this judgment becomes final.

# I.  BACKGROUND

## A.  Underlying Crime

After Foust and his girlfriend, Janira Acevedo, ended their relationship, Acevedo began staying at the home of her friends, Damaris Coreano and Cheyla Coreano. Damaris's and Cheyla's father, Jose, also lived at the Coreanos' home. While Acevedo was living with the Coreanos in 2001, Foust broke in to the Coreanos' home, which led the Coreano family to seek a restraining order. The Coreanos were unsuccessful.

In the morning of March 31, 2001, Foust was "getting pretty wasted" and began looking for Acevedo. *State v. Foust*, 823 N.E.2d 836, 845 (Ohio 2004). Foust first looked for her at a different home, but when he could not find her, he went to the Coreanos' home. After entering through an "open basement window," Foust realized that Acevedo was not at the Coreanos' home either. *Id.* Foust found Jose in his first-floor bedroom and struck him "on the head with a claw hammer," causing Jose's death. *Id.*

Next, Foust went upstairs to Damaris's bedroom, where Damaris was asleep. She awoke while Foust was on top of her with a knife at her neck. When Damaris attempted to grab the knife, "Foust told her not to be a hero because 'in reality heroes die.'" *Id.* Foust asked Damaris where "'the money'" was located and threatened to kill her if she did not name its location. *Id.* Damaris did not know what money Foust was referencing. She responded by saying that she had a dollar and telling Foust where her dollar was located.

Foust asked Damaris if she was a virgin, removed her clothes, tied her hands behind her back, and "ordered her to perform oral sex. When she refused, [Foust] pointed his knife at her neck and asked her if she wanted her father to live. Damaris then performed oral sex on him." *Id.* Afterward, Foust vaginally raped Damaris "multiple times." *Id.* Foust left briefly, returning to vaginally rape Damaris once more. "Damaris asked why he was 'doing this to a Christian,' and he replied that if she was a real Christian, she would forgive him. Foust then ordered her to get on her knees and pray

out loud for him." *Id.* Damaris complied, praying that God would "help [Foust] realize what he was doing. Foust told Damaris to shut up, put her back on the bed, and raped her again." *Id.* Foust put a shirt over Damaris's head.

Foust took Damaris to her sister's bedroom, where, despite having a shirt over her head, Damaris saw Foust steal several items. Foust then took Damaris to the bathroom, where he "tied her hands and feet together with shoestrings" and "tied Damaris to the bathtub leg with a chain belt." *Id.* Foust instructed Damaris not to move and Foust left the bathroom. When he returned, he accused Damaris of moving and said "[y]ou think I'm playing with you." *Id.* He cut off one of Damaris's braids, put his knife to her vagina, and "threatened to slice her open if she moved." *Id.*

Left alone, Damaris smelled smoke. When she removed the shirt that covered her face, Damaris saw that her house was on fire. Foust had lit fires in the bedrooms of Jose, Damaris, and Cheyla, driven Jose's car two blocks, parked the car, and walked to a friend's house. Meanwhile, Damaris escaped from the belt that had bound her to the bathtub. She crawled to her bedroom and used the fire that Foust had lit on her mattress to burn the shoestrings off her wrists and ankles. After extinguishing the fire in her bedroom, Damaris went downstairs and made a futile attempt to locate her father, who she did not know was dead, amid the smoke.

Damaris ran to a neighbor's home for help. By the time that police and firefighters arrived, the home was "engulfed in flames." *Id.* at 846. Damaris identified her assailant as "'Kelly'" to the police. *Id.* "Although she was unsure of his last name, she thought it was 'Foster or something like that.'" *Id.*

**B. Prosecution and Preparation for the Mitigation Hearing**

Foust waived his *Miranda* rights and confessed to breaking into the Coreanos' home, striking Jose with a hammer, and raping Damaris. "However, Foust claimed that he 'didn't intentionally want to do any harm' and said, 'I really don't know what I was doing, just trying to find out where Jani[r]a was.'" *Id.* (alteration omitted). Foust

pleaded not guilty and was appointed two attorneys—Charles K. Webster and Donald Butler—on April 13, 2001.

After waiving his right to a jury, Foust proceeded to trial on December 12, 2001 before a three-judge panel. Foust "presented no evidence during the guilt phase." *Id.* at 847. On December 14, 2001, the three-judge panel convicted Foust of the aggravated murder of Jose Coreano; the kidnaping, rape, gross sexual imposition, and attempted murder of Damaris Coreano; and aggravated burglary, aggravated robbery, and aggravated arson.

Important for this appeal is the involvement of Dr. James Karpawich during this time period. Karpawich was appointed by the trial court on June 13, 2001 as an "independent psychiatric expert" to evaluate Foust's "sanity at the time of the act and competency to stand trial." App'x Vol. 2 at 300 (Journal Entry Granting Mot. for Indep. Psychiatric Expert). Four months later, on October 18, 2001, Foust's attorneys requested funds to appoint Karpawich as a "mitigation specialist," *id.* at 372 (Mot. for Appropriation of Funds for Mitigation Expert), and the court appointed Karpawich on December 3, 2001, *id.* at 402.[1] On December 12, 2001, Karpawich received a voicemail from Foust's attorneys informing him that he "should prepare to testify for the mitigation hearing 'in three or four days.'" App'x Vol. 3 at 1202 (Karpawich Aff. ¶ 11). (The mitigation hearing was later postponed by 30 days.) Karpawich had not heard from Foust's attorneys in months. He explained via a faxed letter that counsel had never informed him of any expectation that he would assist with the mitigation phase. The next day, Foust's attorneys spoke with Karpawich by phone to inform him of his appointment as a mitigation specialist. During this conversation, Karpawich asked whether a social worker also had been appointed to assist with the mitigation phase. Webster said no. Karpawich "pointed out that usually there was a social worker working on the mitigation aspect of a capital case." *Id.* at 1203 (Karpawich Aff. ¶ 12).

---

[1]This motion, like others that Foust's attorneys filed, was taken verbatim and without attribution from an online template. *Compare* App'x Vol. 2 at 372–75 (Mot. for Appropriation of Funds for Mitigation Expert), *with* "Hamilton County Public Defender - Orders, Motions, and Entries Template Page," http://www.hamilton-co.org/pub_def/orders_and_entries.htm (follow "Funding the Defense" hyperlink; then follow "Mot. for Appropriation of Funds for Mitigation Expert" hyperlink) (2010).

On many occasions, Karpawich recommended to Foust's attorneys that they (1) obtain records relating to Foust's upbringing, (2) speak with potential witnesses, and (3) meet with Karpawich:

- September 20, 2001: Karpawich "recommended that the attorneys obtain a court order directing Cuyahoga County Children's Services to release their records related to Kelly Foust and his family for the purpose of eventual mitigation." *Id.* at 1202 (Karpawich Aff. ¶ 10).

- December 13, 2001: Karpawich faxed Foust's attorneys a letter in which he "reminded them that on September 20, 2011, [he] had recommended they obtain records from Children's Services to be used during the mitigation phase of the Foust capital trial." *Id.* at 1202–03 (Karpawich Aff. ¶ 11).

- December 13, 2001: By phone that same day, Butler told Karpawich that the attorneys "had not obtained a copy of the Children's Services records and that they had not contacted any member of the Foust family." *Id.* at 1203 (Karpawich Aff. ¶ 12).

- December 16, 2001: Webster wrote to Karpawich, saying that he and Butler would like to meet with Karpawich at Karpawich's convenience. *Id.* at ¶ 13.

- December 21, 2001: Karpawich sent a letter to the attorneys "recommending that they obtain records from Cuyahoga County Children's Services, the Cuyahoga County Jail[,] and other sources." *Id.* at 1204 (Karpawich Aff. ¶ 14).

- December 31, 2001: Karpawich sent a letter to the attorneys, "remind[ing] them that [Karpawich] still had not received the Children's Services records." He "again recommended that they obtain Kelly's records reflecting his time in the Cuyahoga County jail since his arrest. Karpawich told the attorneys that he could meet with them on January 2, 4, or 5, 2002. *Id.* at ¶ 15.

- January 4, 2002: Concerned because he had not heard from the attorneys since the December 16 letter, Karpawich left a voicemail with Webster. Webster did not return the call. Karpawich also phoned Butler, who stated that he "had not talked to Webster since the end of Kelly's trial, and . . . had not obtained any of the records [that Karpawich] had requested." Karpawich "recommended that [Webster] speak to witnesses for the mitigation hearing." *Id.* at ¶ 16.

- January 4, 2002: After the conversation with Butler, Karpawich faxed a letter to both attorneys, again "recommend[ing] that they contact Kelly's sister GaryAnne, his mother Barbara[,] and his father Gary Sr." He provided telephone numbers for those three family members and attached "four pages of notes and suggested

questions for the attorneys to ask the witnesses." After the fact, Karpawich observed that the attorneys "used many of the questions I suggested, with little deviation." Karpawich "ended the letter stating: 'I am still able to meet with you tomorrow to discuss mitigation issues.'" *Id.* at 1204–05 (Karpawich Aff. ¶ 17). The attorneys did not respond.

- January 5, 2002: Via fax to the attorneys, Karpawich "reiterated [his] recommendations regarding interviewing witnesses and getting pertinent records for mitigation." He added that his experience from other capital cases was that "family members and other witnesses testified first to establish the basis for the opinions [that Karpawich] would be stating" at the mitigation hearing. Karpawich asked the attorneys to inform him which witnesses would testify and what documents would be entered as evidence. "Even though there was only one more full day before the January 7, 2002 hearing," Karpawich again stated that he was available to meet with the attorneys before the hearing. *Id.* at 1204 (Karpawich Aff. ¶ 18). The attorneys did not respond.

In fact, counsel performed minimal work on Foust's case during the weeks between conviction and the mitigation hearing. Butler's Motion, Entry, and Certification for Appointed Counsel Fees shows that, between December 14, 2001 (the date of conviction) and January 7, 2002 (the date of the mitigation hearing), Butler worked only seven days and a total of 28 hours. Butler did not work any hours between December 18, 2001 and January 2, 2002. Similarly, Webster's fee statement shows that he worked nine days and a total of 24.5 hours between conviction and the mitigation hearing.[2]

In the end, the attorneys never met with Karpawich before the mitigation hearing. The attorneys never spoke to any of Foust's family members before the mitigation hearing. They did not prepare Barbara or Gary to testify. *Id.* at 1226 (Barbara Aff. ¶ 4); *id.* at 1227 (Gary Sr. Aff. ¶ 2). The attorneys never sought the Children's Services records that Karpawich repeatedly asked them to obtain. The attorneys never requested funds for a substance-abuse expert to aid the defense team's preparation for the mitigation proceedings.

---

[2]The fee statements were part of "the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. —, 131 S. Ct. 1388, 1398 (2011). The submission and approval of the bills is reflected on the state trial court docket. App'x Vol. 2 at 4.

**C. Mitigation Hearing**

The mitigation phase of trial began and ended on January 7, 2002. Three witnesses testified on Foust's behalf: Foust's father, Gary; Foust's mother, Barbara; and Karpawich. Their testimony established that Foust, who was born in 1977, was the sixth of eight children: GaryAnne, Gary Jr., Terrance, Julie, Jeremy, Kelly, Amy, and Kara. Karpawich testified that Foust's early years "were marked by a lot of violence and instability, which had a traumatic effect on Kelly's upbringing." App'x Vol. 7 at 2646–47 (Karpawich Test.). In 1981, his younger sister, Kara, died of carbon monoxide poisoning from a car malfunction. Shortly afterward, Foust and his siblings were split up in foster care for over a year before being returned to their parents.

At home, Foust's parents had physical fights and blamed each other for initiating the altercations. Gary testified that Barbara sometimes "wanted to fight" and would "hit [Gary] with stuff." *Id.* at 2595 (Gary Test.). Gary said that "[m]ost of the time" he "was just defending" himself. *Id.* at 2599. He admitted that he was an alcoholic, however, and Barbara testified that Gary beat her badly. She visited emergency rooms "[s]everal times" to receive medical care after the fights, and she "used to believe that [her] natural skin tone was black and blue." *Id.* at 2621 (Barbara Test.). Gary denied that the children were present during their parents' fights, but admitted that "you could hear what's going on whether they see it or not." *Id.* at 2585 (Gary Test.). Barbara testified that her oldest daughter "would sneak out of the house to a pay phone" to call the police during the fights, "and sometimes . . . she was so little she had to stand on a chair or on telephone books to reach the phone." *Id.* at 2621 (Barbara Test.).

As for the treatment of the children, Gary testified that he was "overprotect[ive]," *id.* at 2600 (Gary Test.), providing "a controlled environment" where the "kids were never out of our sight," *id.* at 2585. When asked whether he was physically violent toward the children, Gary said "Yes and no," *id.*, and "[n]ot really," *id.* at 2600, although he acknowledged causing a "little physical, [a] little mental" abuse, *id.* There were "[t]imes when [he] was mad [and] probably hit [the children] harder than [he] should have," but "[i]t wasn't an everyday thing" and "three to six months" might pass between

his drinking episodes. *Id.* According to Barbara, however, Gary treated the children "[v]ery badly. He was very violent. He was always – if he wasn't hitting, he was screaming, he was threatening, he was ridiculing, berating them, everything they ever did wasn't good, nothing they ever did was okay." *Id.* at 2620–21 (Barbara Test.). She testified that Gary would "kick" the children and "strike" them with "[h]is fist[ or] whatever he could pick up." *Id.* at 2622. Barbara said that she "[o]ccasionally" struck her children with only her hand to discipline the children. *Id.* at 2623. There was little discussion of how Barbara interacted with Foust.

In comparison to his older brothers, Foust was relatively passive in the face of his father's abuse. *Id.* at 2646 (Karpawich Test.). Foust "never seemed to respond. . . . [H]e would cry when he was young, but [he did not] fight back or retaliate . . . ." *Id.* at 2623 (Barbara Test.). "[H]e was the child that got lost in the shuffle because he never did anything bad to draw attention to himself." *Id.* Barbara described Foust as a "straight A student" until seventh grade, *id.*, when "[h]e just totally changed. It was like, the old Kelly stopped existing and someone new took over his body." *Id.* at 2625. Foust stopped attending school, began committing crimes, and found himself in a juvenile facility.

Hardly any testimony focused on the physical condition of the Fousts' home. Gary said simply that their home "wasn't well kept." *Id.* at 2586 (Gary Test.). There was no mention of sexual abuse.

When Gary and Barbara divorced in 1985, Barbara retained custody of the children. When Barbara was arrested in 1987 or 1988, four of the children, including Foust, went to live with Gary; the rest stayed with their oldest sister, GaryAnne, who was 18. During that time, Gary "pa[id] this lady $50 a week [to] t[ake] care of the kids, g[e]t them up, put them to school, [and] fe[e]d them." *Id.* at 2592. Because he had lost his job and was recovering from his alcohol addiction, Gary felt that there "wasn't too much [he] could do" to raise his children. *Id.* When Barbara was released from custody in 1990, Foust left Gary's home to live with Barbara. Gary never saw Foust again until the trial, in part due to a restraining order.

In 1994, Terrance was shot and killed. Terrance had been Foust's role model. Shortly after Terrance's death, Foust attempted to kill himself while he was in a juvenile facility.

In sum, Karpawich testified that the "violence throughout [Foust's] upbringing . . . has an impact on the way he would interact with other people, especially women." *Id.* at 2648 (Karpawich Test.). Karpawich diagnosed Foust with alcohol dependence and major depressive disorder. *Id.* at 2649. Karpawich testified that, "when depression is mixed with alcohol[,] then someone's judgment is even more significantly impaired." *Id.* at 2650. During his incarceration prior to sentencing, Foust was "a very appropriate prisoner" who functioned well in controlled environments. *Id.* at 2654.

After the other witnesses had testified, Foust made an unsworn statement in which he expressed confusion about his actions. Foust said that, on the night of the murder, he had "a lot of unstable emotions and mixed feelings" that he "couldn't handle." *Id.* at 2666 (Foust Statement). "The only thing" Foust was intending when he went to the Coreanos' home was "to seek one person that I thought would listen to me." *Id.* at 2665. He told the Coreanos that he was "sorry for everything that happened. I didn't mean it. It was nothing intentional. . . . I lost track, I think, of myself with the reality around me." *Id.* at 2668.

On January 11, 2002, the three-judge panel sentenced Foust to death. The panel explained why it found Foust's upbringing, as presented at the mitigation hearing, insufficient to mitigate against death:

> All three members of the panel were struck by the testimony of the defendant's parents, and of Dr. Karpawich, as to the circumstances of Kelly Foust's formative years: an alcoholic father verbally and physically abusing all four of his sons; frequent fights between the parents, accusations of adulterous conduct in the family home; all the children sent to foster care on one occasion for several months following the tragic accidental carbon monoxide poisoning that injured the defendant, his mother, and three older siblings, and caused the death of his two-year-old sister; his mother's imprisonment for another period of time; and finally, his parents' rancorous divorce, which led to his father's enforced estrangement from the defendant for the past ten years. This

background unquestionably helped the panel place the defendant into context. Nevertheless, ultimately we could not conclude that it was sufficient to mitigate the punishment for a series of criminal acts of outrageous depravity, violence, and cruelty.

App'x Vol. 2 at 486 (Op. of Trial Judges).

## D. Direct Appeal and Postconviction Proceedings

Foust appealed directly to the Ohio Supreme Court, which reweighed the aggravating circumstances and mitigating factors. Finding that "Foust offered no significant mitigating evidence," the court affirmed the imposition of the death penalty. *State v. Foust*, 823 N.E.2d 836, 871 (Ohio 2004).

Foust filed a petition for postconviction relief that raised, among other claims, ineffective assistance of counsel at the penalty phase. The petition for postconviction relief is the first time that the Ohio courts heard a complete account of Foust's childhood. The state trial court denied the petition for relief. The court found that the new evidence "paints a truly grisly picture of the Foust home; however, it is a picture already painted vividly by the testimony that was received at trial." App'x Vol. 5 at 1710–11 (Postconviction Op.). The trial record was "replete with evidence . . . as to Kelly Foust's history of abuse and neglect," showing that Foust grew up "in a 'family that can only be described as dysfunctional and marked by an alcoholic father.'" *Id.* at 1709; *see also id.* at 1711. Given the testimony at the mitigation hearing, "the decision not to call additional witnesses evidently was a tactical one, in order to avoid cumulative testimony." *Id.* at 1709. The court also found that Foust was not prejudiced because "[i]t was rather the inhuman and gratuitous brutality of petitioner's conduct--not any lack of evidence as to his psyche--that was overwhelming in compelling all three judges to reach the decision they reached both independently and unanimously." *Id.* at 1711. The Ohio Court of Appeals affirmed, *State v. Foust*, No. 83771, 2005 WL 2462048 (Ohio Ct. App. Oct. 6, 2005), the Ohio Supreme Court denied review, *State v. Foust*, No. 2005-2260, 108 Ohio St. 3d 1509 (2006), and the United States Supreme Court denied certiorari, *Foust v. Ohio*, 549 U.S. 874 (2006).

On March 22, 2007, Foust filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio that raised ten claims. The district court denied the petition in its entirety and denied a certificate of appealability. We granted a certificate of appealability on one issue: "Whether counsel rendered ineffective assistance in the penalty phase by not obtaining a trained mitigation specialist, not obtaining the records needed to present Foust's life history, not interviewing mitigation witnesses, not interviewing Dr. Karpawich in a timely manner, and not obtaining a substance-abuse expert." 6th Cir. 9/21/09 Order.

## II.  ANALYSIS

### A.  Standard of Review and Legal Standard

Because Foust filed his habeas petition in 2007, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to his case. Under AEDPA, we may grant habeas petitions for claims that the state court adjudicated on the merits if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We review the decision of the district court de novo. *Tibbetts v. Bradshaw*, 633 F.3d 436, 441 (6th Cir. 2011).

Under *Strickland v. Washington*, Foust received ineffective assistance of counsel if his counsel's performance was constitutionally deficient and Foust was prejudiced as a result. 466 U.S. 668, 687 (1984). The Supreme Court has emphasized that "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. —, 131 S. Ct. 770, 786 (2011). The combined effect of *Strickland* and § 2254(d) is "'doubly deferential'" review. *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. —, 129 S. Ct. 1411, 1413 (2009)). Put differently, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

In this case, the state courts considered Foust's claim of ineffective assistance on its merits. The last reasoned decision of the Ohio courts on the issue of hiring a substance-abuse expert stated that Karpawich's testimony was an "alternative device[] that fulfilled the same functions as the expert assistance sought." *Foust*, 823 N.E.2d at 859 (internal quotation marks and alteration marks omitted). For all other components of the ineffective-assistance claim, the Ohio Court of Appeals on postconviction review deemed the actions and inaction of Foust's attorneys a "tactical decision designed to avoid cumulative testimony, which had no bearing on the outcome of the trial." *Foust*, 2005 WL 2462048, at *9. We therefore afford double deference to both state-court decisions on both prongs of the *Strickland* test.

## B. Performance

Counsel's performance is deficient if it "fell below an objective standard of reasonableness," making "errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. ABA Guidelines in effect at the time of Foust's trial instructed attorneys to make "'efforts to discover *all reasonably available* mitigating evidence.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added)).[3] At the mitigation phase, Ohio law instructs the three-judge panel to "weigh against the aggravating factors[] . . . 'the history, character, and background of the offender,'" among other items. *Jells v. Mitchell*, 538 F.3d 478, 495 (6th Cir. 2008) (emphasis omitted). "Thus, to provide professionally competent assistance in Ohio capital cases, defense counsel must conduct a reasonably thorough investigation into all possible mitigation evidence that would present a sympathetic picture of the defendant's family, social, and psychological background." *Id.* at 495–96.

---

[3] We rely on *Wiggins*, as well as other cases that postdate the Ohio Court of Appeals' decision in this case, because *Wiggins* "did not rest on 'new law' but instead 'applied the same "clearly established" precedent of *Strickland*.'" *Johnson v. Bagley*, 544 F.3d 592, 599 (6th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 522)).

We afford Foust's counsel the "'strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen*, 131 S. Ct. at 1407 (quoting *Strickland*, 466 U.S. at 689–90). Even so, we cannot imagine a reasonable argument that counsel's inaction was strategic. Counsel's performance was so deficient that the Ohio Court of Appeals was unreasonable to conclude that the attorneys' performance satisfied the Sixth Amendment.

### 1. Failure to Investigate Adequately By Obtaining Records and Interviewing Mitigation Witnesses

"[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). In this case, Foust's dire upbringing formed the crux of the mitigation strategy, yet counsel failed to investigate Foust's upbringing in any way. Counsel's failures fall in two categories: failure to obtain records and failure to interview family members.

Foust's attorneys admit that they did not gather any of the copious Children's Services records that relate to Foust and his family. App'x Vol. 4 at 1353 (Butler Aff. ¶ 4); *id.* at 1479 (Webster Aff. ¶ 7). Both attorneys now say that they would have introduced the records at the mitigation hearing had they obtained them. *Id.* We cannot fathom why counsel failed to obtain those records. At the mitigation hearing, counsel's strategy was to evoke sympathy for Foust based on the deplorable conditions of his childhood. To this end, Karpawich repeatedly reminded counsel of the importance of gathering the records. App'x Vol. 3 at 1200–05 (Karpawich Aff. ¶¶ 10, 11, 14, 15). There is no question that a reasonable attorney would believe records of Foust's childhood to be relevant to a defense about the conditions of Foust's childhood. This conclusion is amplified by the relative recency of Foust's childhood, given that Foust was only twenty-four when he committed the crimes. App'x Vol. 2 at 484 (Sent. Op.). Nevertheless, Foust's attorneys "failed to act while potentially powerful mitigating

evidence . . . would have been apparent from documents any reasonable attorney would have obtained." *Bobby v. Van Hook*, 558 U.S. —, 130 S. Ct. 13, 19 (2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 389–93 (2005)).

Counsel also failed to interview any of Foust's siblings. App'x Vol. 3 at 1213 (Amy Aff. ¶ 26); *id.* at 1221 (Julie Aff. ¶ 11)[4]; *id.* at 1224 (Jeremy Aff. ¶ 10). Amy, Julie, and Jeremy have submitted affidavits saying that they would have testified on Foust's behalf. *Id.* at 1206–24.[5] In addition, the attorneys did not interview Foust's parents before they testified at the mitigation hearing. Gary "never received an explanation about what mitigation was" and no one discussed his testimony or possible questions that the prosecutor might ask. *Id.* at 1228 (Gary Aff. ¶ 6). Barbara received "a half-ass explanation of mitigation[ that] was real high-pressure," *id.* at 1225 (Barbara Aff. ¶ 3), and counsel "never discussed the specifics of" her testimony or what questions the prosecution or defense might ask, *id.* at 1226 (Barbara Aff. ¶ 4).

Although counsel interviewed Foust a few times, the only other information that they had prior to the mitigation hearing was "four pages of notes and suggested questions for the attorneys to ask the witnesses" that Karpawich prepared and faxed to the attorneys on January 4, 2002—the last business day before the mitigation hearing was scheduled to begin. *Id.* at 1204 (Karpawich Aff. ¶ 17).[6]

---

[4]In his post-trial affidavit, Karpawich omits Julie from the list of family members whom he interviewed. App'x Vol. 4 at 1204 (Karpawich Aff. at ¶ 17). Inconsistently, Karpawich testified at the mitigation hearing that he "interviewed" Julie, App'x Vol. 7 at 2645 (Karpawich Test.), while his written mitigation report says that he only "contacted" Julie, App'x Vol. 5 at 2074 (Karpawich Report). The mitigation report uses the term "contacted" to refer to Gary as well, *id.*, and Gary testified that his conversation with Karpawich "lasted for about ten minutes," App'x Vol. 4 at 1228 (Gary Aff. at ¶ 5). It is feasible that Karpawich contacted Julie for a similarly short period of time that did not constitute an interview. What is undisputed, though, is that defense *counsel* never contacted or interviewed Julie.

[5]GaryAnne's affidavit does not expressly say that she (1) was not interviewed by the defense attorneys and (2) was willing to testify. Karpawich's testimony is that he interviewed GaryAnne. No one contends, however, that GaryAnne was interviewed by the defense attorneys.

[6]Karpawich's Mitigation Evaluation report is dated Saturday, January 5, 2002. Although he says that he "gave this report to the attorneys beforehand," it appears that he gave the report to the attorneys on January 7, 2002, on the morning of the mitigation hearing itself. App'x Vol. 3 at 1205 (Karpawich Aff. ¶ 19).

The Ohio Court of Appeals, which provided the last reasoned decision on the issue, characterized the omission of the Children's Services records and sibling testimony from the mitigation hearing "a tactical decision." *Foust*, 2005 WL 2462048, at *9. That description is nonsensical because "counsel did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum*, 558 U.S. —, 130 S. Ct. 447, 453 (2009). Foust's "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527.

This is not a case like *Van Hook*, in which counsel simply "fail[ed] to dig deeper" into the defendant's background. 130 S. Ct. at 19. Foust does not contend that his counsel should have sought information "from more distant relatives" such as a "stepsister, two uncles, and two aunts." *Id.* Indeed, Foust's counsel failed to interview *anyone* or seek *any* Children's Services records. The Court in *Porter* itself draws this distinction to distance the facts from those of *Van Hook*. *Porter*, 130 S. Ct. at 453; *see also Jells*, 538 F.3d at 493 (finding ineffective assistance based on counsel's "brief" interviews of only three family members and the "[in]sufficiently probing questions" that counsel asked at those interviews).

Although we afford strong deference to Foust's attorneys, we also find it inconceivable that Foust's attorneys chose not to interview Foust's parents and siblings on account of potential damage to Foust's defense. In *Pinholster*, evidence of the defendant's childhood neglect would have damaged a "family sympathy" mitigation defense. 131 S. Ct. at 1404. Foust's counsel were not making a family-sympathy defense. To the contrary, counsel elicited from the parents themselves information about how they failed to care for Foust. Exploring Foust's background by interviewing his family and by finding Children's Services records could only have aided counsel's strategy of exposing the horror of Foust's childhood. In addition, the defense in *Pinholster* was based primarily around the petitioner's mother, giving the attorneys good reason to limit their investigation of other family members. Foust's upbringing, however, was characterized by parental failure and neglect, making the siblings'

experiences more relevant than what parents might choose to admit about their own failings. Failure to conduct the investigation was deficient performance.

### 2. Failure to Interview Karpawich

Counsel's failure to interview Karpawich about his investigation and findings was also deficient performance. In death penalty cases, Karpawich "usually talk[s] with the attorneys (and frequently the mitigation specialist) before the trial begins so that [he] can share [his] findings and obtain a full understanding of the case in preparation of [his] testimony at mitigation." App'x Vol. 3 at 1202 (Karpawich Aff. ¶ 8). Those meetings, according to Karpawich, are crucial to "determine how the information [he] obtained and analyzed can be used at the client's trial and mitigation." *Id.* In this case, however, Karpawich had "*no* discussion with the attorneys about Kelly Foust prior to [Karpawich's] testimony." *Id.* (emphasis added). Karpawich's affidavit makes clear that he was willing to meet with counsel up to and including the day before the mitigation hearing. *Id.* ¶ 18.

By neither interviewing Karpawich about his investigation nor conducting any independent investigation, Foust's attorneys in effect delegated to Karpawich, who is not an attorney, the strategic decisionmaking about how to present Foust's mitigation defense. Counsel's conduct thereby differs from the types of representation of which the Supreme Court has approved. *See Van Hook*, 130 S. Ct. at 18 (holding that attorneys did not perform deficiently because they "contacted their lay witnesses early and often," were "in touch with one" expert witness "more than a month before trial, and . . . met with the other for two hours a week before the trial court reached its verdict"). By abrogating decisionmaking responsibility, Foust's attorneys "were not in a position to make . . . reasonable strategic choice[s]." *Wiggins*, 539 U.S. at 536. Counsel's performance fell short of "prevailing professional norms" and the minimum representation that the Sixth Amendment guarantees. *Strickland*, 466 U.S. at 688.

### 3. Failure to Hire Specialists

### a. Trained Mitigation Specialist

Even the appointment of Karpawich, a clinical psychologist who is not a trained mitigation specialist, was suspect. Although defense teams do "not have a specific obligation to employ a mitigation specialist, they d[o] have an obligation to fully investigate the possible mitigation evidence available." *Jells*, 538 F.3d at 495. The failure to hire a trained mitigation specialist is particularly troublesome when "counsel's awareness" of the client's difficult background "should have alerted them that further investigation by a mitigation specialist might [have] prove[n] fruitful." *Id.* at 496.

Karpawich alerted counsel to the fact that most death-penalty investigations include a mitigation specialist, which he was not. App'x Vol. 3 at 1203 (Karpawich Aff. ¶¶ 12, 13). Based on Karpawich's "experience[,] . . . a mitigation specialist or social worker is important for a thorough and comprehensive development of family history and collection of records." *Id.* at 1202 (Karpawich Aff. ¶ 8); *accord id.* at 1231 (Dorian Hall[7] Aff. ¶ 13) (explaining that capital defense teams generally include a mitigation specialist in addition to a psychologist). In response, the state contends that a person who disclaims specialization in the field of mitigation cannot then assert with authority that a mitigation specialist should have been appointed. The state's argument is not sound. It does not take a specialist to know that specialists exist. Even if Karpawich were qualified as a mitigation specialist, he did not fulfill that role because he was unable to collect Children's Services records and did not conduct thorough or sufficient interviews with Foust's family.

Given the nature of Foust's mitigation defense and his counsel's failure either to consult regularly with Karpawich about his investigation or to conduct an independent investigation, failing to hire a trained mitigation specialist was deficient performance.

---

[7]Dorian Hall has "been employed as a mitigation specialist by the Office of the Ohio Public Defender since August 1988 and ha[s] served as the supervisor of the mitigation section since August 1994." *Id.* at 1229 (Dorian Hall Aff. ¶ 1). She has "been involved in the investigation and/or preparation of over one hundred and fifty death penalty cases at both the trial and appellate levels in the states of Ohio and Indiana." *Id.* at 1230 (Dorian Hall Aff. ¶ 4).

### b. Substance-Abuse Expert

With regard to hiring a substance-abuse expert, however, the state courts were not unreasonable in finding that counsel's performance was adequate. On direct appeal, the Ohio Supreme Court stated that Karpawich's testimony was an "alternative device[] that . . . fulfilled the same functions" that a substance-abuse expert would have served. 823 N.E.2d at 859. Karpawich had "testified that Foust was diagnosed with 'alcohol dependence.'" *Id.* Karpawich's written report, which was introduced into evidence, stated that "Foust reported 'abusing alcohol heavily around the time of the present offenses.'" *Id.*

Foust speculates that an expert could have testified about "the genesis of Foust's addiction, its effect on his judgment and impulsivity, and how it lessens his culpability." Appellant Br. at 35. While Karpawich's testimony could have been more expansive, his testimony was not dramatically different from this speculation about what a substance-abuse expert could offer. Foust has not offered any evidence that a substance-abuse expert could have added any other information. Thus, the Ohio Supreme Court did not act contrary to or unreasonably apply Supreme Court precedent on the sub-claim about the substance-abuse expert.

### 4. Summary of Performance Prong

We recognize that we must "affirmatively entertain the range of possible reasons [Foust]'s counsel may have had for proceeding as they did." *Pinholster*, 131 S. Ct. at 1407 (internal quotation marks omitted). However, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690–91). Put differently, "an unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury." *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) (citing *Rompilla*, 545 U.S. at 382–83, in which the Supreme Court found an investigation unreasonable even though

the attorneys spoke to the defendant, five family members, and three mental-health witnesses).

Foust's attorneys acted similarly to the attorneys in *Johnson*. In that case, we concluded that counsel failed adequately to investigate and present Johnson's family history, even though a doctor "testified at the mitigation hearing that Johnson's family unit was 'someplace between terrible and chaotic,' that [the defendant's] neighborhood was 'less than optimal,' and that [his mother] 'was abusing drugs heavily at the time of Johnson's birth." 544 F.3d at 602 (internal alteration marks and citations omitted). Although Foust's counsel presented some evidence at the mitigation hearing, their investigation was inadequate. Without acquiring rudimentary details, Foust's attorneys could not have made a reasonable professional judgment to limit their investigation. There is simply no strategic reason for Foust's counsel not interviewing family members, not obtaining records, not consulting with Karpawich, and not hiring a mitigation specialist. Because there is no reasonable argument that Foust's attorneys lived up to the minimum standard of representation that the Sixth Amendment ensures, the Ohio Court of Appeals unreasonably applied *Strickland*.

## C. Prejudice

Deficient performance prejudices the defense if "[c]ounsel's errors [were] so 'serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 131 S. Ct. at 787–88 (quoting *Strickland*, 466 U.S. at 687). In other words, but for the error, there must be "a substantial, not just conceivable, likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403. "To assess th[e] probability" that Foust would have received a different sentence had his counsel not performed deficiently, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation." *Porter*, 130 S. Ct. at 453–54.

"[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th

Cir.), *cert. denied*, 546 U.S. 1039 (2005). In other cases, we have found prejudice because the new mitigating evidence is "different from and much stronger than the evidence presented on direct appeal," "much more extensive, powerful, and corroborated," and "sufficiently different and weighty." *Goodwin v. Johnson*, 632 F.3d 301, 328, 331 (6th Cir. 2011). We have also based our assessment on "the volume and compelling nature of th[e new] evidence." *Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007). If the testimony "would have added nothing of value," then its absence was not prejudicial. *Van Hook*, 130 S. Ct. at 19. In short, "cumulative mitigation evidence" will not suffice. *Landrum v. Mitchell*, 625 F.3d 905, 930 (6th Cir. 2010), *petition for cert. filed* (Apr. 4, 2011) (10-9911).

The Ohio Court of Appeals found that the testimony presented at the mitigation hearing already "portrayed the abusive and dysfunctional home life of Foust, the history of abuse by Foust's father, and Foust's alcohol dependency." *Foust*, 2005 WL 2462048, at *9. In that court's view, the new evidence merely "reiterate[d] what a dismal home life Foust endured as a child." *Id.* We find this conclusion unreasonable. The testimony at the mitigation hearing "only scratched the surface of [Foust]'s horrific childhood." *Johnson*, 544 F.3d at 602. Far from being cumulative, the new evidence paints an altogether different picture of Foust's childhood. The new evidence would have given Foust a substantial likelihood of receiving a different sentence.

### 1. Whether Evidence Not Presented at the Mitigation Hearing Would Have Been Cumulative

#### a. Squalor and Chaos of the Foust Home

In 1980, when Foust was nearly three years old, he and his siblings were removed from their home because of their mother's arrest. Cuyahoga County Welfare Department records describe the condition of the home on the day that the children entered state custody: "the home had a strong stench from feces (human and animal) which was all around, smeared on walls and clothing in piles on the floor. There were garbage bags full all around and flies." App'x Vol. 3 at 1039. On another day, "[t]he stench was strong, as the door was open a small amount." *Id.* at 1040. Finding clean clothes for the

children was a "difficult task" because "the rooms were in complete disorder." *Id.* at 1039. "The children stated they had not been fed the night before or that day." *Id.* "The baby[, Amy,] had a severe diaper rash and loose bowels. Jeremy and Kelly were in diapers which were dirty." *Id.* The notes also describe the children as "basically dirty" and "dirty and dissheveled [sic]." *Id.* at 1039–40. Their clothes were "in poor repair and dirty." *Id.* at 1040. Another record from 1980 reports that "there was vomit on the floor in their apartment." *Id.* at 1123.

These miserable conditions persisted throughout Foust's childhood. In 1985, when Foust was eight, a social worker visited the Foust home. Although the social worker knew from the Fousts' social-services record that their "homekeeping standards" were "submarginal," the social worker was "shocked at the total deprivation and pre[]ponderance of filth, indicating the absence of any standard of housekeeping. The home . . . was a lice infested, canine feces factory with no hot water and little food for 9 children and one adult." *Id.* at 1033. The social worker "immediately" turned to the Homemaking Department of the Department of Human Services for cleaning services. *Id.* After one visit, however, the Homemaking Department determined that it could

> no longer provide service, as requested, in the future. The home has 2 cats, 2 dogs, mice and fleas jumping everywhere. There are animal feces also everywhere. The children appear to have lice and are scratching due to the infestation of fleas. There is also very little food in the home [and no] hot water. The children are dirty and in need of baths. This case is being denied ongoing service due to uninhabitable living conditions. . . . [W]e feel that these children being left in this home continue to be at risk.

*Id.* at 1036. Another worker called the home a "pig sty." *Id.*

The siblings' affidavits support this dire depiction. Amy described their home as "filthy," with "cockroaches and mice everywhere. No one did dishes," and "there was always a pile of dirty dishes." *Id.* at 1206 (Amy Aff. ¶ 2). The home did not have gas or hot water when a social worker visited in 1985, *id.* at 1033, and Amy said that gas and electricity were "routinely turned off," *id.* at 1206 (Amy Aff. ¶ 2).

Foust's parents also neglected to perform other household duties. Foust's mother "never cooked for us kids. If you were hungry, you had to make something for yourself or you would starve." *Id.* at 1206–07 (Amy Aff. ¶ 2). Amy also said that Barbara "never did the laundry":

> When all the clothes were dirty, [Barbara] would go to Goodwill and get a couple bags of clothes. When those clothes got dirty, she would go back to Goodwill and get more bags of clothes. There were piles of clothes in the basement. Once, when I was ten years old, I went to the basement to do some laundry but couldn't because fleas were in the clothes and they bit me all over my legs.

*Id.* at 1207 (Amy Aff. ¶ 3). The children "were not required to take baths" and could "go for a month without a bath, if [they] wanted to." *Id.*

Passing references at the mitigation hearing to minor maladies in no way conveyed the abysmal condition of Foust's childhood home. Gary testified that the home "wasn't well kept." App'x Vol. 7 at 2586 (Gary Test.). Karpawich's mitigation evaluation said merely that Foust's mother "did not clean the home and . . . the children suffered from head lice," App'x Vol. 5 at 2076 (Karpawich Report), and his oral testimony never broached the subject. Because the facts adduced at the mitigation hearing on this point were neither numerous nor detailed, we conclude that the new evidence is substantially different and not cumulative.

### b. Maternal Abuse and Neglect

When Foust "tried to impress" his mother by attaining "good grades," Barbara responded: "'You're still a worthless piece of shit.' Later, when [Foust] got a job, [his] mother responded the same way." App'x Vol. 3 at 1207–08 (Amy Aff. ¶ 6). Barbara insulted her children in many contexts; for example, she derided Amy by calling her a "stupid whore" who could not "do anything right." *Id.* These facts contrast starkly with the trial evidence, in which Barbara reflected on a time when Foust earned good grades by saying that Foust had "'blossomed.'" App'x Vol. 5 at 2077 (Karpawich Report). Barbara's disapproval would have stung Foust strongly because of his earlier attachment to his mother. After Kara died in 1980, social services reported that the three-year-old

Foust "is the most obviously disturbed by the recent trauma in the family." App'x Vol. 3 at 1038. Foust was "very attached to his mother and d[id] not relate well to strangers. He cr[ied] when approached by anyone other than his mother." *Id.* A different evaluation described Foust as a "withdrawn" child who "clung" to his mother. *Id.* at 1040.

In addition to emotional abuse, Barbara perpetrated physical abuse. She "punished" the children by beating them with a belt, throwing items such as shoes, dishes, and food at the children, "smacking" them "across the face," and sending the children to bed hungry. *Id.* at 1207 (Amy Aff. ¶ 5). In 1992, Amy expressed fear of "wear[ing] a belt because her mother will beat her with it." *Id.* at 1055 (Intake Referral Form). Barbara's violence extended to her treatment of Gary Sr., at whom she "would throw pots and pans" as well as "bottles." *Id.* at 1219–20 (Julie Dep. ¶ 4).

Although testimony at the mitigation hearing showed that Gary Sr. had substance abuse problems, the new evidence shows that Barbara did as well. As of 1985, she was an "alcoholic" who "has not attempted to quit" drinking. *Id.* at 1164 (Social Services Notes). Amy states in her affidavit that her mother "spent a lot of time drinking at bars" and would "return home in a drunken stupor" or "return home to smoke marijuana or take pills before passing out. *Id.* at 1212 (Amy Aff. ¶ 21).

These particular facts are small pieces of more systemic neglect. A social worker noted that "Mrs. Foust had problems in functioning" and "appeared to be in a daze." *Id.* at 1039. Amy described her mother as "an embarrassment. I always wondered how she could sit there, look at her children suffer, and not do anything about it." *Id.* at 1207 (Amy Aff. ¶ 4). Amy has no contact with her mother but does not "miss her." *Id.*

> She's the kind of mother you regret. She makes you sad - she could do so much better, if she cared. It's disgusting to think about. When I was about five years old, our mother decided she wasn't going to be a wife and mother anymore. She moved next door with a man named Randy Kipp. She would sneak in and out of our house so that I wouldn't see her and cry for her not to leave.

*Id.* External observers witnessed Barbara's neglect as well. One social worker "could never understand how Barbara Foust, . . . residing two blocks away[,] could remain absent and never inquire about her children." *Id.* at 1033 (6/21/88 Notes).

Barbara resisted much-needed intervention from social services. On one occasion in 1984, Barbara threatened to shoot any social worker who came to her home. *Id.* at 1080. In 1988, a social worker observed that the Fousts "have always scapegoated social services agencies, the courts[, and] their children." *Id.* at 1033.

At the mitigation hearing, the testimony accredited the abuse and neglect to Foust's father, never revealing that Foust's mother perpetrated the same types of harm. The testimony at the mitigation hearing "misled" the three-judge panel into believing that Foust had "a stable influence in [his] life who did everything she could to help him." *Johnson*, 544 F.3d at 604.[8] The reality was more grim. We conclude that the evidence about emotional and physical abuse from Foust's mother is not cumulative, and its effect is strong because of the loss of both parents' support. *Cf. Sutton v. Bell*, No. 03-5058,

---

[8]On the question of how Foust's mother interacted with Foust, the dissent accuses of us "'gross distortion'" of the record. Dissent at 37 (quoting *Bobby v. Van Hook*, 130 S. Ct. at 18). We emphatically disagree. At no point do we suggest that the mitigation panel was deluged with evidence of Barbara's affection. The key point is that the evidence at the mitigation hearing pinned all abuse on Gary, while showing that Barbara was another parent involved in Foust's life who was not abusive. This juxtaposition itself was misleading. Moreover, at mitigation, the only evidence about how Barbara interacted with Foust was Karpawich's report, which stated that Barbara took pride in how Foust had "blossomed" when he attained good grades. App'x Vol. 5 at 2077 (Karpawich Report). As explained above, that claim is belied by the new evidence, meaning that the three-judge panel was misled.

In addition, the evidence that the dissent cites does not support its conclusion. First, that Foust's early upbringing was "marked by a lot of violence and instability" says nothing about how Barbara behaved, much less her dealings with Foust. App'x Vol. 7 at 2646. Karpawich's testimony that "[t]here was no stability in the home" was regarding "parents fighting, . . . frequent moves," and "the chaos." *Id.* at 2648.

Second, we find wholly irrelevant that, "although Kelly had sent [Barbara] numerous letters [after] his arrest for Jose Coreano's murder, she had just 'left them sit [sic] on [her] T.V." Dissent at 37 (citing App'x Vol. 7 at 2637 (Barbara Test.)) (alteration in dissent). What happened *after* the crime has scant relationship to the factors that influenced Foust to *commit* the crime. Far from showing longstanding neglect, it seems that Barbara's inaction was a result of shock and her "ang[er] at Kelly" for the crime. *Id.*; *see also id.* at 2638 ("I just don't think I could deal with seeing him in jail.").

Third, the dissent notes that Barbara "mismanaged the family's finances," "failed to pay the bills on time," and was arrested for "writing bad checks." App'x Vol. 5 at 2076 (Karpawich Report). A mother can be derelict in financial responsibilities without being abusive and neglectful of her child. Isolated and temporary absences are not always evidence of neglect. Gary accused Barbara of being "mentally unstable" and having affairs. Barbara, in turn, said that Gary was the one who abused her and that her actions were in self-defense. Spats between parents say little about whether a mother abused and neglected *her child*. Finally, Karpawich's letter said that Foust "raised concerns about his mother" in a sentence between topics of bipolar disorder and asthma. *Id.* at 2079 (Karpawich Report). Even if those five words could be construed to show Foust's doubts about Barbara's mental stability—and they cannot—certainly they did not raise the issue of Barbara's abuse and neglect of Foust.

— F.3d —, 2011 WL 2207315, at *9 (6th Cir. June 8, 2011) (discounting mitigation evidence because Sutton, the petitioner, had "one constant and positive influence: his grandmother, who raised him and adequately provided for him").

### c. Incest and Sexual Abuse in Foust's Home

In 1988, when Foust was 11 years old, Amy "found Gary Jr. raping Julie." App'x Vol. 3 at 1209 (Amy Aff. ¶ 11). Foust and Jeremy also "heard them having sex." *Id.* at 1223 (Jeremy Aff. ¶ 8). Several of the siblings informed Barbara and "the case went to Juvenile Court." *Id.* at 1209 (Amy Aff. ¶ 11). However, the charges were dropped after Barbara "made Julie change her story," Gary Jr. threatened Julie with a gun, and Gary Jr. kicked Barbara in the stomach in front of all of the children. *Id.* at 1209 (Amy Aff. ¶ 11).

Later, Amy also became a victim of sexual abuse in the Fousts' home. Jeremy molested Amy beginning when Amy was 10 years old. *Id.* at 1210 (Amy Aff. ¶ 15). When Amy sought help, her mother "slapped [her] . . . for reporting the abuse." *Id.* In addition, "Gary Jr. pulled a gun" on Amy, telling her that he would not "hesitate to shoot" her if she tried to report the abuse again. *Id.* Amy escaped the Foust home by running away to a shelter. She "spent the rest of [her] teenage years in residential children's centers, psychiatric hospitals, and foster care." *Id.* at 1211 (Amy Aff. ¶ 16). During a home visit in 1994, however, Amy "woke up with Jeremy on top of [her,] trying to rape [her] with a knife to [her] throat." *Id.* (Amy Aff. ¶ 18); *see also id.* at 1064 (Hotline Referral Form). Julie, who awoke to Amy's screams, witnessed the assault. Amy attempted suicide after the attack.

We conclude that the evidence about sexual abuse in Foust's home is a new subject matter that was not addressed at the mitigation hearing. At that hearing, Karpawich testified that Foust "experienced violence throughout his upbringing, which has an impact on the way he would interact with other people, especially women." App'x Vol. 7 at 2648 (Karpawich Test.). However, Karpawich never mentioned that the

cause may have been sexual abuse to which Foust was exposed.[9] Although the victims of the sexual abuse were Foust's sisters, Foust's acclimation to sexual abuse of women is particularly relevant because rape was one of the aggravating circumstances that supported the death penalty. *Foust*, 823 N.E.2d at 868–69; *cf. Phillips v. Bradshaw*, 607 F.3d 199, 217–19 & n.2 (6th Cir. 2010) (finding that evidence about sexual abuse of the petitioner's siblings—of which Phillips apparently was unaware—and speculation about sexual abuse of the petitioner had no "specific causal nexus" to the petitioner's rape of a "helpless toddler"), *cert. denied*, 131 S. Ct. 1605 (2011).

### d.  Good Acts That Foust Performed

Foust "made a big difference in [Amy's] life" because he convinced her to stop strip dancing and cease using drugs. App'x Vol. 3 at 1213 (Amy Aff. ¶ 24). Amy's description of how Foust intervened on her behalf is insightful: "Kelly cried as he begged me to stop . . . dancing, drugging, and drinking. . . . He said he was crying because I was turning out just like the rest of my family." *Id.* "Because of Kelly," Amy quit her job at a strip club and became a waitress. *Id.* Although Julie's affidavit asserts that Amy "is back to her old tricks – drinking, drugging[,] and stripping," *id.* at 1220 (Julie Aff. ¶ 5), Foust's *success* in reforming Amy is not the point. Amy's affidavit shows that Foust was *attempting* to fix—and, at least for a time, succeeded in fixing—some of the faults that he saw in his family.

Years earlier, Foust also "saved [a] baby from being shot" during a drive-by shooting at the Fousts' home. *Id.* at 1212 (Amy Aff. ¶ 22). GaryAnne's young daughter was in a swing near the middle of the room. Foust "jumped toward the baby" and "pushed the swing toward the wall and away from the bullet, which lodged in the wall a few inches from the baby's swing." *Id.*

---

[9]The dissent says that evidence of incest and sexual abuse is cumulative because it "prove[s] a point that [Foust] already made": "that Foust grew up learning that violence toward women was normal." Dissent at 35 (citing evidence that Gary had affairs with other women and physically abused Barbara). The dissent interprets "subject matter" (or, in the dissent's terminology, "point") too narrowly. Sexual abuse is different than consensual affairs. Sexual abuse is different than physical abuse. And sexual abuse of children is different than physical abuse of parents. The distinction between sexual abuse and physical abuse is all the more pronounced because rape—not a consensual affair and not physical abuse—was an aggravating factor in this case. The evidence is not cumulative.

Because nothing at the mitigation hearing indicated that Foust had performed these or any other positive acts, we conclude that this evidence is not cumulative. *See Sutton*, 2011 WL 2207315, at *8 (identifying "positive or redeeming" qualities as one factor that may make newfound mitigation evidence overwhelming).

### e. Paternal Abuse and Neglect

Some of the evidence about Gary's abuse is cumulative. For example, Gary stabbed the family's dog to death in front of the children. App'x Vol. 3 at 1223 (Jeremy Aff. ¶ 5). Evidence at the mitigation hearing showed that Gary was violent and abusive, however, and this is only one vivid example. Also, Foust points to his father's failure to provide heat, jackets, and food in 1986 when he and his brothers lived with their father. Gary Jr. also sometimes stole food stamps to sell for drugs. Trial evidence, however, showed that Foust's father spent "money on alcohol while the family lacked basic needs." App'x Vol. 5 at 2075 (Karpawich Report). Despite adding some detail, these pieces of new evidence are not substantially different.

However, Gary's neglect of Foust's physical injuries is newly documented in Jeremy's affidavit:

> When Kelly was 6 or 7 years old, he was ordered to get our father a cup of hot water. Kelly spilled the water on himself which gave him a serious burn to his shoulder. Kelly asked to go to the hospital but my father told him 'Fuck you. Stand in the corner.' My brothers Gary Jr., Terrance[,] and myself came up with a plan to help Kelly. Gary Jr. distracted our father while Terrance and I grabbed pork chops out of the freezer and put them under Kelly's shirt to cool the burn.

*Id.* at ¶ 6. In contrast, at the mitigation hearing, the prosecutor emphasized that the testimony showed "no specific instances in which the defendant was ever abused by his father." App'x Vol. 7 at 2671 (Prosecutor's Closing Statement). The prosecutor said he could not "recall hearing one single isolated incident where any particular physical abuse took place involving Kelly and his dad," and "f[ou]nd" that fact "to be particularly interesting." *Id.* We conclude that the evidence of how Gary neglected Foust in physically injurious ways is not cumulative.

### 2.  State's Responses

To dispute the allegations of prejudice, the state makes several arguments.  First, Foust's postconviction petition was heard by the Honorable Stuart A. Friedman, the same judge who presided over the three-judge panel that sentenced Foust to death.  The state emphasizes Judge Friedman's postconviction finding that additional mitigating evidence would not have altered the panel's decision.  In *Schriro v. Landrigan*, the Supreme Court found it "worth noting . . . that the judge presiding on postconviction review was ideally situated to make [a particular] assessment because she is the same judge that sentenced Landrigan . . . ."  550 U.S. 465, 476 (2007).  *Landrigan* is inapplicable to the case before us because Ohio law requires unanimity among a three-judge panel for a sentence of death.  Thus, "any one of the three judges alone could have prevented imposition of the death penalty."  *Dickerson v. Bagley*, 453 F.3d 690, 699 (6th Cir. 2006).  Judge Friedman's view that the aggravating factors were too extreme for any mitigators to overpower them tells us little about how the other two judges might have viewed the new evidence, even if we were to give controlling weight to Judge Friedman's post-hoc remarks.  Our role is to decide whether Judge Friedman's conclusion was reasonable, and we find that it was not.

Second, the state attacks the credibility of some of the new witnesses, citing "derogatory comments" that GaryAnne made about her siblings, Jeremy's incarceration at the time of trial, and Barbara's testimony that Julie had "a lot of issues."  Appellant Br. 34–36.  The state contends that the testimony of GaryAnne in particular would have been "possibly damaging."  *Id.* at 36.  Yet the fact "[t]hat someone may make a bad witness is no explanation for not interviewing her first."  *Johnson*, 544 F.3d at 600.  Moreover, the state admits that the facts of Foust's upbringing were "uncontested."  Appellant Br. at 37.  At issue was not the *credibility* of the depiction of Foust's upbringing, but the *categories and details* that the depiction included.  In fact, the troubled adult lives of Foust's siblings would bolster Foust's claim that his childhood home was toxic.

Third, the state proposes that Foust was not prejudiced by his counsel's failure to obtain the Children's Services records because the documented events took place before Foust was born or before he was three years old. The state is partly correct as to timing. The record shows the Fousts' long history of neglecting their children that predated Foust's birth. Some of those facts shed light on the environment in which Foust was raised. The facts that we have cited, however, took place after Foust was born and at various times during his childhood.

Fourth, we agree with the state that the failure to admit records from the Department of Youth Services did not prejudice Foust. Karpawich testified that Foust behaved well and obtained good grades during his time in the juvenile facility. Karpawich also testified that Foust behaved well in the controlled environment of the prison where Foust resided while awaiting trial. App'x Vol. 7 at 2654–55. These are not new facts, nor are they ones on which we base our holding.

### 3. Reweighing the Mitigating and Aggravating Factors

Although Foust's childhood was the subject of testimony at the mitigation hearing, the Supreme Court has "never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented" at the mitigation hearing. *Sears v. Upton*, 561 U.S. —, 130 S. Ct. 3259, 3266 (2010). The Supreme Court, in fact, has found prejudice in cases in which counsel presented "a superficially reasonable mitigation theory during the penalty phase" but later evidence revealed counsel's failings. *Id.* at 3266.

In this case, counsel presented some evidence at the mitigation hearing, but the evidence in no way conveyed the horror of Foust's childhood or Foust's attempt to combat his family history by helping Amy. By 1988, a social worker concluded that "[t]he Foust family has a continuous social services history of mental neglect, non[-]nurturance, drug and alcohol usage, substandard living habitats[,] and an overall defiant, confrontational lifestyle that has developmentally delayed and conceivably retarded any reasonable expectations one . . . might wish for the Foust children." App'x Vol. 3 at 1032. This type of evidence reveals far more than "minor additional details."

*Van Hook*, 130 S. Ct. at 20. The new information "picture[s Foust's] childhood . . . very differently from anything defense counsel had seen or heard." *Rompilla*, 545 U.S. at 390. Had the full information been available to the three-judge panel who sentenced Foust to death, there is a reasonable probability that one judge would have opted to sentence Foust to life imprisonment.

We acknowledge that "[t]he aggravating circumstances were, as the state court suggested, overwhelming." *Sutton*, 2011 WL 2207315, at *8. Foust's crime was heinous. Powerful aggravating circumstances, however, do not preclude a finding of prejudice, even when our review is constricted to assessing the reasonableness of how the state court weighed the mitigating and aggravating factors. *See, e.g.*, *Mason v. Mitchell*, 543 F.3d 766, 769 (6th Cir. 2008) (finding prejudice even though the petitioner raped a woman and beat her to death using "a blood-stained board with protruding nails"); *Jells*, 538 F.3d at 484–85 (finding prejudice even though the petitioner abducted a woman and her child, beat the mother to death in front of the child, and dumped her body and abandoned the crying child at a junkyard). The new evidence about Foust's family history is overwhelming, and it undermines reasonable confidence in the reliability of Foust's death sentence.

## III. CONCLUSION

Despite Foust's gruesome crime, there is a reasonable probability that, had the three-judge panel heard the true horror of Foust's childhood, at least one of the judges would not have sentenced Foust to death. The Ohio Court of Appeals's conclusion to the contrary was unreasonable, and the district court erred when it denied Foust's petition. On the issue of ineffective assistance of counsel, we **REVERSE** the judgment of the district court and **GRANT** a conditional writ of habeas corpus vacating Foust's death sentence, unless the State of Ohio commences a new penalty-phase trial against Foust within 180 days from the date on which this judgment becomes final.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Chief Judge, dissenting.  This case involves heinous wrongdoing, both on the part of Foust and on the part of those who were charged with his care as a young child.   There is no doubt that Foust endured a truly horrific childhood.   And I cannot disagree with the majority's conclusion that his counsel performed deficiently for failing to conduct further investigation during the mitigation phase.[1]  However, I do not agree with the majority that the Ohio Court of Appeals' conclusion that Foust was not prejudiced as a result of his counsel's performance was *unreasonable*.

The majority has determined that "[t]he new evidence about Foust's family is overwhelming, and it undermines reasonable confidence in the reliability of Foust's death sentence."  The majority then concludes that the Ohio Court of Appeals' contrary determination is unreasonable.   The majority reaches this conclusion only by distorting the factual record and by conflating fair-minded disagreement with unreasonableness. Without determining whether any reasonable argument could support the state court's decision that Foust was not prejudiced, the majority evaluates the evidence and makes its own conclusion.  It then pronounces "unreasonable" that with which it disagrees.  But the Supreme Court has made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Williams v. Taylor*, 529 U.S. 362, 410 (2000).  Our task is not to determine whether or not we agree with the state court.  Rather, our task is to determine whether "there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *See Harrington v. Richter*, 131 S.

———————————

[1] I do not join the majority's broader discussion of defense counsel's performance, nor am I confident that *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), permits us to consider defense counsel's fee statements under these circumstances.  Although the fee statements were before the state trial court, *Cullen* permits us to consider only "the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 1398.  We are reviewing the decision of the Ohio Court of Appeals—the court that adjudicated Foust's *Strickland* claim on the merits—and there is nothing in the record indicating whether the fee statements were part of *that* court's record.  *Cullen* simply does not make clear whether or not we should assume that the record before the state trial court was part of the record of the court whose decision we are reviewing.

Ct. 770, 788 (2011) (emphasis added).  Because I believe that there are reasonable arguments to support the state court's determination, I respectfully dissent.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted).  In order to prevail under *Strickland*, a petitioner must show (1) that his "counsel's representation fell below an objective standard of reasonableness," and (2) that the petitioner was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 691 (1984).  To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  A petitioner must meet both prongs of *Strickland*, and the court may address them in either order.  *Id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

The state court's decision simply cannot be called an unreasonable application of *Strickland*.  Much of the evidence that the majority characterizes as "new" is substantially similar to evidence that was presented to the three-judge panel (evidence, I would add, that the three-judge panel specifically found to be insufficient to outweigh the statutory aggravators, *see* App'x Vol. 2 at 503 (Trial Ct. Op.)).  The remaining evidence, which is arguably not cumulative, does not compel the conclusion that Foust's death sentence was unreliable.

"[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength *and* subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (emphasis added) (surveying cases in which habeas petitioners claimed prejudice). Although Foust now presents more *detailed* (and therefore arguably stronger) mitigation evidence, most of his evidence simply does not differ in *subject matter* from that which the sentencing panel heard in the first instance.

For example, the new evidence about the condition of Foust's childhood home is more vivid and detailed than what the three-judge panel heard at sentencing. At sentencing, Gary Foust testified that the home was not well-kept and that the children were "pretty much [] on their own." Dr. Karpawich's report indicated that Barbara Foust did not clean the house and that "the children suffered from head lice." Those characterizations are euphemistic when compared to Social Services' description of a "lice infested, canine feces factory" with little food and no hot water. Yet this evidence, despite being more detailed than what the three-judge panel heard, does not establish prejudice because it does not differ in subject matter from the evidence actually presented. The panel already knew about the unclean and unsanitary state of Foust's childhood home. It was therefore not an unreasonable application of *Strickland* for the state court to conclude that Foust was not prejudiced by his attorneys' failure to present this evidence. *See Hill*, 400 F.3d at 319.

As for evidence of incest and sexual abuse among Foust's siblings, it is true that this evidence, specifically, was not presented at sentencing. However, it is still cumulative in the sense that Foust presents it now to prove a point that he already made before the three-judge panel. Foust argues that this new evidence would have demonstrated that he was brought up in an atmosphere which normalized violence toward women. But the panel knew that Foust grew up learning that violence toward women was normal.[2] Barbara Foust testified that Gary Foust abused her so frequently that she "believe[d] [her] natural skin tone was black and blue." Dr. Karpawich reported to the panel that Foust's sister, Garyanne, believed as a child that "men would not get arrested . . . for beating up their wives." The panel heard ample evidence of the frequent and severe physical and emotional abuse that went on in the Foust household, abuse which Dr. Karpawich testified had "an impact on the way [Foust] would interact with other people, especially women." The evidence of incest and sexual abuse among Foust's siblings is another example of the violence that Foust witnessed toward women;

---

[2]In terms of deviant sexual behavior, the panel learned that Gary Foust would frequently bring women home from a bar and banish his wife (Foust's mother) from the bedroom. Obviously this is not so severe as violent incest among siblings, but it establishes that the panel was aware that Foust grew up in an atmosphere where violence and deviant sexual behavior were commonplace.

although sexual abuse is a specific type of physical violence and abuse, both types of evidence prove the same point, and that point was presented to the three-judge panel. This evidence simply does not "add[] up to a mitigation case that bears no relation" to the one actually put before the panel. *See Rompilla v. Beard*, 545 U.S. 374, 393 (2005).

Nor is the evidence of Gary Foust's neglect of Foust's physical injuries either stronger or different from what was presented at sentencing. At sentencing, defense counsel presented evidence of Gary Foust's violence and abuse towards his family, and specifically towards Foust—including that Gary was a violent alcoholic; frequently beat his wife and children; inflicted especially strong abuse on his sons, including Foust; and that his children, including Foust, were "terrified" of him.[3] Gary Foust admitted that there were times when he "probably hit [his children] harder than [he] should have," and Barbara Foust testified that Gary Foust would strike the boys with his fist or "whatever he could pick up," and also kick them. The panel learned that, unlike his siblings who would retaliate, Foust was afraid to fight back and merely took the abuse quietly. In light of this evidence, I simply cannot agree with the majority that Gary's Foust's neglect of Foust's physical injuries is not cumulative. Gary Foust's indifference towards Foust's physical injuries is illustrative of his abusive and violent nature. In many ways, the evidence that was actually presented is *more* compelling than the newly documented evidence: it is hard to see how neglecting a child's physical injuries is worse than actually *causing* similar injuries.

Although much of the evidence that the majority cites is in fact cumulative, some of the evidence that Foust's counsel failed to present arguably does differ in both strength and subject matter from the evidence that was presented to the panel. Foust's attempts to reform his sister Amy and his act of "saving a baby's life" were not presented

---

[3]To bolster its conclusion that Foust was prejudiced, the majority cites the prosecutor's closing statement, that he could not "recall hearing one single isolated incident where any particular physical abuse took place involving [Foust] and his dad." *See* Maj. Op. 35 (quoting App'x Vol. 7 at 2671). In light of the ample evidence that Gary Foust specifically abused Foust, the prosecutor's statement can only be considered a criticism of the level of detail presented regarding Gary Foust's abuse. Although the evidence that Gary Foust neglected Foust's burns on one occasion is indeed more detailed and specific, it cannot establish prejudice because it is insufficiently different from the evidence that was actually presented. *See Hill*, 400 F.3d at 319.

at the sentencing phase; and indeed, the picture of Foust's character that was presented "offer[ed] nothing in mitigation." *See Ohio v. Foust*, 823 N.E.2d 836, 870 (Ohio 2004).

Further, the evidence presented at mitigation did not portray the extent of abuse and emotional abandonment that Foust suffered from his mother. However, neither was the three-judge panel "misled" into believing that "Foust has 'a stable influence in his life who did everything she could to help him.'" *See* Maj. Op. at 25 (alteration omitted) (quoting *Johnson v. Bagley*, 544 F.3d 592, 604 (6th Cir. 2008)). Quite the contrary, defense counsel presented evidence establishing the utter lack of *any* stability in Foust's life (the family was "marked by a lot of violence and instability, which had a traumatic effect on Kelly's upbringing"); ("There was no stability in the home."). Specifically with respect to Barbara Foust, the panel heard that she was incarcerated when Foust was a young child, was mentally unstable, had extramarital affairs with various men, was violent toward Gary Foust, did not clean the house, neglected the family finances, and did not pay the bills. They also learned that Foust himself believed his mother had mental problems. Further, contrary to the majority's claim that the three-judge panel was led to believe Barbara Foust did everything she could to help her son, Barbara Foust told the panel that, although Kelly had sent her numerous letters since his arrest for Jose Coreano's murder, she had just "left them sit [sic] on [her] T.V." In light of the evidence that was presented, the majority's claim that the panel was "misled" into believing that Barbara Foust was a stable and encouraging influence is a "gross distortion." *See Bobby v. Van Hook*, 130 S. Ct. 13, 18 (2009) (per curiam) (characterizing the Sixth Circuit's misrepresentation of the factual record as a "gross distortion").

Even in light of the new evidence—regarding Foust's redeeming acts and his mother's emotional abandonment and abuse—the state court's determination that Foust suffered no prejudice cannot be called unreasonable. The mitigating evidence in this case is indeed compelling, but so are the statutory aggravators: murder during the course of an aggravated burglary, aggravated robbery, kidnapping, aggravated arson, rape, and attempted murder. I simply cannot agree with the majority that the Ohio Court of Appeals unreasonably applied *Strickland* when it concluded that Foust suffered no

prejudice from his counsel's failure to present additional mitigation evidence.  To say that reasonable people cannot disagree as to whether Foust was prejudiced is the epitome of unreasonableness.  *Cf. Harrington*, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").

I respectfully dissent.