**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0732n.06

No. 10-1089

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jul 06, 2012*

LEONARD GREEN, Clerk

ROBERT WILKENS, JR.,

    Petitioner-Appellant,

v.

BLAINE LAFLER, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

Before: BOGGS, SUHRHEINRICH, and COOK, Circuit Judges.

COOK, Circuit Judge. State prisoner Robert Wilkens, Jr., imprisoned for criminal sexual conduct in the first degree, appeals the denial of his habeas petition. He claims two constitutional violations: 1) that the presence of uniformed Department of Corrections officers in the courtroom and discarded shackles left in the jury's view violated his Sixth Amendment right to a fair trial, and 2) that he received ineffective assistance of counsel because trial counsel failed to move for the suppression of statements obtained without a *Miranda* warning. We AFFIRM.

## I. Background

One night, Wilkens drove up to M.C., a street prostitute, and propositioned her for sex. She entered his truck and he drove her to an empty field. After they undressed, Wilkens held a butcher knife to M.C.'s throat and threatened to sodomize her if she refused to fellate him. Once M.C.

complied, Wilkens dropped her off where he found her before, told her he would come back to pay her, and never returned.

Sometime later, M.C. reported the incident to Detective Robert Peto of the Ypsilanti Police Department. While investigating other reports of sexual assault on local prostitutes, Peto noticed similarities between M.C.'s assault and that of another prostitute, V.H. Both victims independently identified Wilkens as their assailant, both independently described Wilkens's truck and license plate, and both assaults involved a proposition on the street, a ride to a remote lot, and threats to sodomize while brandishing a knife.

At trial, M.C. and Peto testified on behalf of the government. Unable to locate V.H. for trial, the government submitted parts of V.H.'s preliminary-examination transcript as evidence. Wilkens elected to take the stand as well, presenting a theory that M.C. and V.H. fabricated the assault allegations to extort money from him. The jury found Wilkens guilty of first-degree criminal sexual conduct. After unsuccessfully moving for a new trial and exhausting state procedures, Wilkens petitioned for a writ of habeas corpus in federal district, which was denied. Only a fair-trial claim and an ineffective-assistance-of-counsel claim remain on appeal.

A.      Facts Involving the Fair-Trial Claim

Wilkens protests that the trial-courtroom conditions violated his right to an impartial jury under the Sixth and Fourteenth Amendments. Although he attended his trial unshackled and in plain

clothes, two guards in Department of Corrections uniforms sat behind him because he was serving time for other convictions. (The parties dispute how near the guards sat, and the last state court to comment on the issue simply noted that the guards sat "near defendant.") His trial counsel objected to the presence of the guards in Department of Corrections uniforms and suggested that the judge permit the guards to appear in plainclothes or county uniforms. The court noted the objection but declined to act.

While the jury deliberated, trial counsel's investigator approached the alternate juror, who remained outside the jury room in a public waiting area. According to trial counsel's affidavit, the alternate juror confided to the investigator and the trial counsel that the jurors noticed the Department of Corrections insignia on the guards near Wilkens, noticed shackles discarded in the jury box, speculated that Wilkens was in prison, and discussed possible verdicts prior to the close of proofs. Using this information, trial counsel moved for a new trial, again objecting to the presence of uniformed guards. The trial court denied the motion.

On appeal, Wilkens shifted his argument, objecting to the "presence" of "prison guards" rather than their uniforms. The state appellate court accordingly ruled on whether the prison guards' "being in the courtroom" denied Wilkens his fair-trial rights, concluding that it did not. The Michigan Supreme Court denied leave to appeal.

On habeas review, Wilkens shifts his objection back to the uniforms. Because his defense turned on pitting his credibility against the credibility of the victims, he claims that any indicia of

3

his incarceration inherently prejudiced his case. He also claims that he suffered actual prejudice, because an alternate juror confirmed that the jurors noticed the prison guards and shackles and deduced his incarceration from these clues. The government responds that fairminded jurists could disagree about whether the uniformed guards and shackles sufficiently affected the proceedings to render the trial unfair.

B.      Facts Involving the Ineffective-Assistance Claim

Wilkens faults his trial counsel for failing to move to suppress his statements to Detective Peto regarding his previous encounters with M.C. He claims that such incompetence violated his Sixth Amendment right to counsel.

During the investigations leading to Wilkens's arrest, Peto and another detective visited Wilkens at his home. Shortly after Wilkens invited them in and consented to a search of his home, the three of them sat around his kitchen table and began to talk. According to Peto, Wilkens volunteered, "I know what this is about. It's a woman. [M.] is her name," and explained that he had paid her for sex, driven her to a field, and used her services.

Wilkens recalls the situation differently. Though he acknowledges that he invited the detectives in and that he signed a consent search form, he claims that the detectives questioned him aggressively throughout their kitchen-table conversation and ensuing search, refusing to relent until he provided the answers they wanted. He purportedly denied any dealings with M.C. or other

4

prostitutes. Because of the allegedly adversarial nature of the questioning—the rapid-fire accusations and the detectives' refusal to let him out of their sight or allow him to speak to his roommate—he argues that the detectives should have advised him of his *Miranda* rights and that his counsel should have moved to suppress the statements.

Having failed on direct appeal, he now raises the same argument on habeas review, contending that the Michigan Court of Appeals unreasonably applied clearly established federal law by concluding that the detectives' questioning and his counsel's failure to move for suppression did not violate his constitutional rights.

## II. Whether the Concurrent-Sentence Doctrine Applies

Because Wilkens currently serves concurrent sentences for other convictions, the government requests that we decline review of this case under the concurrent-sentence doctrine. *See Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989) ("According to this doctrine, accepted by this court, an appellate court may decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction."). We apply this discretionary doctrine only to those situations "where it is clear that there is no collateral consequence to the defendant and the issue does not otherwise involve a significant question meriting consideration." *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992). Because the Michigan Parole Board may consider the "number and frequency of prior criminal convictions" and must consider the "number of prior convictions for sex offenses" in

5

determining parole, *see* Mich. Admin. Code r. 791.7715(2)(a)(ii), 791.7716(3)(b)(v), refusing to

adjudge the constitutionality of Wilkens's conviction may affect his parole opportunities. We

therefore decline to apply the concurrent-sentence doctrine. *Cf. United States v. Vargas*, 615 F.2d

952, 959 (2d Cir. 1980) (considering the effect on parole as one potential collateral consequence

counseling against application of the concurrent-sentence doctrine).

## III.  Fair-Trial Claim

Wilkens argues that the seating of guards in Department of Corrections uniforms near him

and presence of discarded shackles in the jury box created such a probability of prejudice that his

trial inherently lacked due process, in violation of his Sixth Amendment right to a fair trial by an

impartial jury. He also claims that these conditions actually prejudiced jury deliberations.

## A.      Standard of Review

"Under AEDPA, we may grant habeas petitions for claims that the state court adjudicated

on the merits if that adjudication 'resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States.'" *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011) (quoting 28 U.S.C. §

2254(d)(1)). Wilkens urges us to review Michigan's adjudication de novo notwithstanding §

2254(d)(1), for two reasons.

First, he argues that the Michigan Court of Appeals failed to consider the lack of state interests justifying the presentation of guards in Department of Corrections uniforms (as opposed to plainclothes or county uniforms) when evaluating the fair-trial claim. But we cannot fault the court for ignoring an argument that Wilkens failed to raise on appeal. Though Wilkens objected to the guards' uniforms during the trial, he omitted this argument in his state appellate briefs. R. 1-5, at 39–40 (protesting generally to "presen[ce]" of prison guards, without focusing on choice of clothing); R. 16-21, at 14 (arguing the same in motion for reconsideration); R. 16-23, at 51 (arguing the same in brief for motion for remand).

Second, Wilkens contends that the state appellate court addressed only the state fair-trial claim on the merits, ignoring the federal fair-trial claim. Because the state requirement of "affirmative prejudice" differs from the federal standard articulated in *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986), which looks for actual prejudice *or* an inherently prejudicial practice, Wilkens argues that the state court failed to "examine the *Holbrook* issue" and "focused exclusively on actual prejudice."

Wilkens fails to rebut the presumption that the state court adjudicated the federal claim on the merits. *See Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011) ("The presumption [that a state court adjudicated a claim on the merits before denying relief] may be overcome when there is reason to think some other explanation for the state court's decision is more likely."). Though the Michigan Court of Appeals cited no federal cases, it expressly identified the claim as a

federal one, referring to "[t]he Sixth Amendment guarantee of the right to a fair trial" before addressing whether the discarded shackles and guards prejudiced Wilkens. To the extent that Wilkens criticizes the state court for failing to examine the possibility of "inherent prejudice," we construe this as a critique of the state court's application of a rule contrary to federal law, rather than its failure to adjudicate a claim. *See Bell v. Cone*, 535 U.S. 685, 694 (2002) ("A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases . . . ."); *accord Fulcher v. Motley*, 444 F.3d 791, 806 (6th Cir. 2006) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)) (treating application of a contradictory rule as triggering the "contrary to" analysis of § 2254(d)(1), rather than the "adjudicated on the merits" analysis); *see also* 28 U.S.C. § 2254(d)(1) (acknowledging that claims adjudicated on the merits may yet result in a decision contrary to clearly established federal law, meriting habeas relief).

In any case, we discern no conflict between the state appellate court's reasoning and *Holbrook*'s instruction to consider inherent prejudice, and deem Wilkens's excerpted readings of the state opinion insufficient to rebut the presumption that the state court adjudicated the claim on the merits. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) ("Avoiding these pitfalls [of reaching a result "contrary to" clearly established federal law] does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). For one, though Wilkens faults the state court for citing to the state standard of "affirmative[] prejudice," the state court explained that it was applying this standard to evaluate the "juror misconduct" claim—a claim not presented in this appeal. *See* R. 16-

8

21, at 2 ("To obtain a new trial based on juror misconduct, the defendant must show that the misconduct 'affirmatively prejudiced the defendant's right to a trial before a fair and impartial jury' [citing a state case].").

By contrast, the state court's analysis of the limited claim before us—regarding the prejudicial effect of guards and discarded shackles—began by quoting the general *federal* principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on the grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *See Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). (Indeed, Wilkens's own analysis in the state appellate briefs ventured no further, citing *Holbrook* only for this general principle and conclusorily stating, "Violations are prejudicial *per se*," without distinguishing its inherent-prejudice and actual-prejudice arguments.) The court then contrasted the practices targeted in Wilkens's complaints to what *Holbrook* deemed a quintessential example of an "inherently prejudicial practice"—presenting a shackled defendant before a jury—and concluded that no case law supported treating the use of shackles and guards in Wilkens's trial in the same fashion. *See Holbrook*, 475 U.S. at 568–69. Then, the state court observed that Wilkens "[a]dditionally" failed to show "how he was prejudiced by the shackles being seen near him"—addressing the lack of actual prejudice. Though that court never mentioned the terms "*Holbrook*," "inherent prejudice," or "actual prejudice," the opinion's analysis suggests that it applied the correct rule, touching on both types of analysis required under *Holbrook*. We thus

conclude that the state court did not "appl[y] a rule different from the governing law set forth in [the Supreme Court's] cases," *Cone*, 535 U.S. at 694, or fail to adjudicate the federal claim on the merits.

Because Wilkens fails to show the applicability of de novo review, we now turn to the last avenue remaining under § 2254(d)(1) for habeas relief on this claim: whether the state decision involved an unreasonable application of clearly established federal law.

B.      A Fairminded Jurist Could Conclude That Wilkens Received A Fair Trial.

A state decision involves an unreasonable application of clearly established federal law if "'fairminded jurists could disagree that [the arguments or theories that could have supported the state court's decision] are inconsistent with the holding in a prior decision of [the Supreme Court].'" *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1402 (2011) (quoting *Harrington*, 131 S. Ct. at 786).  As a fundamental liberty secured by the Fourteenth Amendment, the Sixth Amendment right to trial by an impartial jury applies to state proceedings. *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  A petitioner may show that a state procedure violated his right to a fair trial either by identifying an inherently prejudicial practice or by demonstrating actual prejudice. *Holbrook*, 475 U.S. at 572.

1.      No Inherent Prejudice

A procedure "involves such a probability that prejudice will result that it is deemed inherently lacking in due process" if it presents "an unacceptable risk . . . of impermissible factors coming into

10

play." *Id*. at 570 (internal quotation marks and citations omitted). The Supreme Court has yet to address whether placing uniformed prison guards near a defendant during his trial inherently prejudices him. The closest analogues that the Court recognizes as "inherently prejudicial" involve "compelling an accused to wear jail clothing," *Williams*, 425 U.S. at 504, or "the sight of shackles and gags" on the accused, *Illinois v. Allen*, 397 U.S. 337, 344 (1970); *Deck v. Missouri*, 544 U.S. 622, 626 (2005) (reiterating that shackling, absent special need, inherently prejudices defendant). But the Court also recognizes that some practices fall short of "inherent prejudice": the placement of four uniformed troopers in the first row of spectators, for example, does not brand the defendant with an "unmistakable mark of guilt." *Holbrook*, 475 U.S. at 571 (quoting *Williams*, 475 U.S. at 518).

This case falls somewhere between these two poles. On the one hand, *Holbrook*'s reassurance that jurors will simply treat these guards as safety officers for the court rather than "reminders of the defendant's special status," *id*. at 569, no longer applies when the uniforms identify the guards as prison officers rather than peace officers. On the other hand, the presence of uniformed prison guards near Wilkens presents a subtler indication of incarceration than shackles or prison garb on a defendant. *See id*. at 571 (contrasting shackling and prison clothes, as "unmistakable indications of the need to separate a defendant from the community at large," against the presence of four officers quietly sitting in close proximity to the defendant, a more ambiguous indication possibly too subtle to notice or open to multiple interpretations). For example, a fairminded jurist could conclude that most jurors would overlook the detail of the insignia on the

11

guard uniforms or infer nothing from them, especially since jurors might not know enough about courtroom procedures to think that the presence of guards from the Department of Corrections are atypical in criminal proceedings. (Wilkens's allegation that the particular jurors in this case *did* notice the insignia relates to the "actual prejudice" analysis, rather than the "inherent prejudice" analysis.) Similarly, the discarding of shackles in the jury box at some point during the trial presents a smaller risk of becoming a "constant reminder of the accused's condition" or a "continuing influence throughout the trial," *see Williams*, 425 U.S. at 504–05, than the shackling of a defendant throughout the trial as a physical restraint.

Given these differences, fairminded jurists could conclude that the presence of a few guards near Wilkens with Department of Corrections insignia fails to create an "inherently prejudicial" circumstance or an "unacceptable risk" of affecting the jury deliberations. Rather than articulating specific rules for identifying unacceptable risks, the Supreme Court simply entreats judges to use common sense: *Holbrook* calls for a case-by-case approach, 475 U.S. at 569, and *Williams* emphasizes scrutiny "based on reason, principle, and common human experience," 425 U.S. at 504. Absent more specific guidance from the Supreme Court, fairminded jurists could vary widely in assessing various details and risks, especially since the closest Supreme Court analogues involve easily distinguishable circumstances. *See Renico v. Lett*, 559 U.S. ___, 130 S. Ct. 1855, 1864 (2010) ("[T]he more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case

12

determinations." (internal quotation marks, alterations, and citations omitted)). We thus reject Wilkens's inherent-prejudice argument.

2.      No Actual Prejudice

Since Wilkens cannot rely on inherent prejudice, he must show actual prejudice. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (equating the term, "actual prejudice," to the *Kotteakos* standard courts typically use for the harmless-error analysis on collateral review: demonstrating an error's "substantial and injurious effect or influence in determining the jury's verdict" (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))).

Wilkens's sole evidence of actual prejudice consists of an affidavit from trial counsel paraphrasing hearsay from an alternate juror that, prior to the close of proofs, the jury noticed shackles left in the jury box, discussed the presence of the Department of Corrections officers, and speculated that Wilkens was in prison. According to trial counsel's affidavit, his investigator and the alternate juror discussed these matters in a public waiting area while the jury deliberated, and trial counsel himself interviewed the alternate juror after the reading of the verdict. But rather than present an affidavit of the *juror's* statements, counsel provided a general paraphrase only, based on *counsel's* account of the *investigator's* report, leaving scant record of what the alternate juror might have actually said—whether the jurors speculated about the guards in passing and quickly forgot about them, or whether the indicia of incarceration became a running theme throughout their pre-proof discussions.

13

Moreover, Wilkens's brief repeatedly claims that the jury "actually discussed [Wilkens's possible imprisonment] in connection with possible verdicts," but, notably, the trial counsel's affidavit fails to assert any "connection" between the jury's observations about the guards and shackles and their deliberations on the verdict. And even if the jury noticed the shackles and recognized the guards as prison staff, an alternate juror who sat outside with counsel's investigator during deliberations would have no knowledge of the actual discussion in the jury room or how prominently the jurors' earlier observations of the shackles and guards figured into their verdict, if at all.

Lacking other evidence, Wilkens urges us to assume prejudice because the trial pivoted on a credibility contest between Wilkens, on the one hand, and M.C. and Peto, on the other. Because the trial judge instructed the jury that it could consider M.C.'s criminal history in determining her credibility, Wilkens contends that the jury probably considered the indicia of his incarceration while weighing his credibility, as well. But this is speculation. Wilkens also argues that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," because "the appellate court's rejection of actual prejudice is objectively unreasonable." But in doing so, he merely faults the legal conclusion that the state appellate court draws from the facts; he points to no erroneous determination of fact. With nothing more than an affidavit based on hearsay, and no evidence illuminating what the jury actually discussed in the jury room, a fairminded jurist need not conclude that the guards and shackles had a "substantial and injurious effect or influence" on the verdict.

14

In the alternative, Wilkens asks for an opportunity to supplement the state record with a habeas evidentiary hearing under 28 U.S.C. § 2254(e)(2), claiming that he diligently requested an evidentiary hearing at each stage of the state proceedings but failed to obtain one. The government correctly notes that *Pinholster* prohibits this relief. *See* 131 S. Ct. at 1398 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Though Wilkens cites *Sheppard v. Bagley*, 657 F.3d 338, 343 (6th Cir. 2011), where one post-*Pinholster* panel considered granting an evidentiary hearing to supplement its § 2254(d)(1) review, we cannot overturn prior panels recognizing that *Pinholster* limits § 2254(d)(1) review to the facts before the state courts. *See, e.g.*, *Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011) (citing *Pinholster*, 131 S. Ct. at 1398, 1400); *see also Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").

## IV. Ineffective Assistance of Counsel Claim

Under *Strickland v. Washington*, a defendant claiming ineffective assistance of counsel must show that "counsel's representation fell below an objective standard of reasonableness" and demonstrate prejudice. 466 U.S. 668, 687–88 (1984). Wilkens argues that his counsel should have moved to suppress his statements to two detectives regarding his previous encounters with M.C. because the detectives obtained the statements after placing him in "custody" without a *Miranda*

15

warning. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966) (holding that police cannot question an individual under custody before notifying him of the right to remain silent, the right to an attorney, and the possible legal consequences of speaking). Failing to do so violated his Sixth and Fourteenth Amendment right to counsel, he contends, because regardless of whether the motion would have ultimately succeeded, any reasonable counsel would have at least attempted to suppress the evidence as sufficiently constitutionally suspect. *See Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000) (holding that counsel rendered ineffective assistance by failing to object to a "constitutionally suspect" use of evidence). The government responds that fairminded jurists could disagree.

A.      No Deficient Performance

When combined with AEDPA deference, our review of trial counsel's performance becomes "doubly deferential": we evaluate "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Foust*, 655 F.3d at 533–34 (internal quotation marks omitted) (quoting *Pinholster*, 131 S. Ct. at 1403; *Richter*, 131 S. Ct. at 788). Wilkens argues that we should review this prong of the ineffective-assistance claim de novo because the state appellate court failed to determine Wilkens's noncustodial status from an objective person's viewpoint. The language of the state opinion directly contradicts this assertion. *See* R. 16-21, at 4 (noting that determination of custody "does not depend on the subjective view of the . . . defendant" and proceeding from the view of "a reasonable person in the defendant's position"). AEDPA deference applies.

Although his conversations with the detectives occurred at home, Wilkens maintains that the objective circumstances of the encounter—the prolonged and accusatory rapid-fire questioning, the detectives' insistence that he direct them from room to room, and his inability to speak to his roommate—transformed his home to a custodial environment, triggering his right to a *Miranda* warning. *See Stansbury v. California*, 511 U.S. 318, 324 (1994) ("[T]he only relevant inquiry [in determining custody] is how a reasonable man in the suspect's position would have understood his situation." (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984))); *Orozco v. Texas*, 394 U.S. 324, 327 (1969) (deeming a suspect "in custody" when police confined him to his bedroom during questioning, because *Miranda* requires warnings whenever police deprive suspect of "*his freedom of action in any significant way*" (quoting *Miranda*, 384 U.S. at 477 (emphasis added in *Orozco*) (internal quotation marks omitted))). The Michigan Court of Appeals disagreed, concluding that "[a] reasonable person in defendant's position would have felt free to leave."

Wilkens exaggerates the favorableness of the state record on habeas appeal, arguing that two detectives relentlessly interrogated him until he gave them the answers they wanted. The actual record reveals a more moderate course of events. Two detectives "requested that [he] consent to a search of [his] home," and Wilkens consented. After receiving this consent but prior to the search, Detective Peto sat with Wilkens at his kitchen table and said, "Let's talk a little bit, you know, try and relax a little bit." According to Wilkens, the conversation eventually became "intense," with both detectives "throwing questions at [him] one after another" and everyone "talkin' at the same

time." He complains that Peto became confused as a result of the disorganized conversation and misrecorded his statements in the police report.

But a fairminded jurist could conclude that counsel acted reasonably in choosing not to move for suppression, given the weak evidence suggesting that Wilkens was in custody at the time he made these statements. At best, the record reveals that Wilkens participated in an unpleasant conversation with the detectives and that, after the fact, he felt dissatisfied with the detectives' characterization of his statements. In other words, Wilkens's testimony throughout criticizes the detectives' *inaccuracy*, rather than their coerciveness. Nothing suggests that this tableside conversation, though antagonistic, was involuntary: Wilkens provides no evidence that the detectives prevented him from moving elsewhere or from terminating the conversation. The detectives entered the home upon Wilkens's consent; the conversation occurred in a casual setting, at Wilkens's own kitchen table; and Detective Peto framed the conversation as an occasion to "talk a little bit" and "relax a bit," though the conversation eventually progressed to a more "intense" exchange.

Given the conversation's mild beginning, a reasonable person would have felt free to stop the conversation or to excuse himself from the kitchen if he sensed that the conversation had become too rankling. *See Stansbury*, 511 U.S. at 322 ("[T]he ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (internal quotation marks, alterations, and citations omitted)). Wilkens's and Peto's testimonies both acknowledge that Peto gleaned the statements at issue during the course of this conversation, prior

to the detectives' search of the house. Therefore, the statements that Wilkens now wishes to suppress occurred in a noncustodial setting, and a fairminded jurist could conclude that Wilkens's counsel acted competently in declining to pursue a suppression motion with such a low probability of success.

Additionally, Wilkens maintains that "[he] was questioned repeatedly by both detectives" *during* the search, as well. But here, too, Wilkens exaggerates the strength of his case. As a preliminary matter, he fails to identify which of the incriminating statements the detectives obtained as a result of the mid-search questioning, as opposed to the pre-search kitchen-table conversation. Furthermore, in characterizing this search as a coercive event in which the detectives "for the most part [did] not let[] him out of their sight," he glosses over the consensual backdrop of the search. Wilkens's subjective impression that "[he] was not allowed to freely walk around [his] home" is irrelevant: a reasonable person in defendant's position would not feel imprisoned by the very search to which he consented. His elaborations in the affidavit reveal that the detectives merely "would direct [him] to a room that they intended to search and stay[] with [him] for most of the search." The fact that the detectives generally refrained from searching rooms without Wilkens's presence and oversight may just as well evince their respect for his ownership of the house, rather than a desire to confine a suspect. Moreover, Wilkens's own attestation of the events belies his theory: the fact that the detectives would stay with him for "most" of the time, rather than all, suggests that Wilkens left the detectives' presence from time to time and that nobody stopped him.

19

Finally, Wilkens argues that one of the detectives "blocked" and "prohibited him" from talking to his roommate, thus "cut[ting] off Wilkens's only source of moral support" and exacerbating the custodial nature of the situation. But Wilkens's affidavit—the sole evidence in the record regarding these mid-search interactions—merely declares that he attempted to talk to his roommate at one point during the search, and that one of the detectives "told . . . [him] that he wanted to talk to her first." A detective's request to speak to the roommate first does not amount to blocking or prohibiting contact, or "cutting off" Wilkens from moral support. Wilkens does not allege that he tried to contact the roommate later or that the detectives prohibited him from doing so. Nor does he attempt to connect this fact to the relevant standard: whether a reasonable person would feel that the detective deprived him of "his freedom of action in any significant way" by asking to speak to the roommate first. Because a court sitting in habeas must limit its review to the state record under these circumstances, *see Pinholster*, 131 S. Ct. at 1398, Wilkens cannot supplement an inadequate affidavit with exaggerations in the brief.

Given the dearth of record evidence suggesting custody, a fairminded jurist could conclude that Wilkens's counsel acted competently in focusing his efforts elsewhere. *See Richter*, 131 S. Ct. at 788 (explaining that *Strickland* requires a showing of "incompetence under 'prevailing professional norms'" (quoting *Strickland*, 466 U.S. at 690)).

B.      No Prejudice

Wilkens fails on the prejudice factor as well.  He urges that we review this factor de novo because the state appellate court decided his ineffective-assistance claim solely on the deficient-performance prong.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing prejudice factor of ineffective-assistance habeas claim de novo because state court pegged its decision solely on deficient performance); *but see Richter*, 131 S. Ct. at 784 (requiring habeas petitioners to show "no reasonable basis for the state court to deny relief" and observing that "[t]his is so *whether or not* the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated" (emphasis added)).  We need not determine what level of deference to apply, however, because even under the de novo standard Wilkens fails to demonstrate prejudice.

"To establish prejudice, a defendant must show a reasonable probability that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *McCalvin v. Yukins*, 444 F.3d 713, 722 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 694); *Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").  Like the petitioner in *McCalvin*, Wilkens fails to demonstrate a probability of changed outcome "sufficient to undermine confidence" because, even if his counsel had filed the motion to suppress, the trial court would have almost certainly denied it as meritless.  Given the already slim

likelihood that the district court would have suppressed Wilkens's statements, we need not examine

what prejudice he might have avoided if he had succeeded in a motion to suppress.

## V.  Conclusion

We affirm the district court's denial of Wilkens's habeas petition.